157 P.3d 859 (2007)
In the Matter of the DISCIPLINARY PROCEEDING AGAINST Bradley R. MARSHALL, Attorney at Law.
No. 200,302-8.
Supreme Court of Washington, En Banc.
Argued September 14, 2006.
Decided May 10, 2007.
*863 Philip Albert Talmadge, Talmadge Law Group PLLC, Tukwila, WA, for Petitioner.
Scott G. Busby, Seattle, WA, for Respondent.
BRIDGE, J.
¶ 1 This attorney discipline case arose out of Bradley R. Marshall's representation of several longshoremen in a workplace racial discrimination case. The Washington State Bar Association's (Association) hearing officer and the Association's Disciplinary Board (Board) found that Marshall improperly shared his fees with Wayne Perryman, a *864 nonlawyer, and then took steps to conceal the fee sharing arrangement. They also found that Marshall inflated his costs and failed to provide an adequate settlement accounting to his clients. In addition, Marshall failed to properly advise his clients of the risks of multiple representation and failed to get their written consent where there was potential conflict of interest. Finally, the hearing officer and Board found that Marshall filed an appeal in the Ninth Circuit Court of Appeals without proper consultation with his clients and without their authorization. The hearing officer found that Marshall acted knowingly with regard to all counts and recommended restitution and a two-year suspension. The Board found that Marshall acted intentionally with regard to some counts and recommended disbarment.
¶ 2 Marshall challenges several findings of fact, as well as the Board's recommendation that he be disbarred. Marshall also argues that he was not given adequate notice of the charges against him or the possible sanctions involved. In addition, he asserts that the hearing officer abused his discretion in an evidentiary ruling.
¶ 3 We uphold the hearing officer's findings of fact for the most part. However, because Perryman had a preexisting agreement with the clients that they would pay him 10 percent of the settlement, we are not convinced that Marshall technically split his fees with Perryman. Even so, Marshall acted dishonestly when he asked Perryman to create an hourly invoice in order to hide a fee arrangement that appeared to be fee splitting. We also conclude that Marshall acted intentionally when he retained several thousand dollars of his clients' settlement money even after he had notice that he had improperly overcharged costs. We hold that the amended formal complaint stated Marshall's acts or omissions in sufficient detail to inform Marshall of the nature of the allegations of misconduct and we find that the trial court did not abuse its discretion on the contested evidentiary ruling. We agree with the Board that Marshall acted intentionally with regard to two counts, but because we find no fee splitting technically occurred, the presumptive sanction in this case is now suspension. After considering the new presumptive sanction, the lack of unanimity supporting the Board's disbarment recommendation, and sanctions imposed in similar cases, we conclude that the appropriate sanction is an 18-month suspension and restitution in the amount of $44,473.75.

I

Facts and Procedural History
¶ 4 Marshall was admitted to the practice of law in Washington in 1986. The charges at issue here arose out of Marshall's representation of 15 African-American and Hispanic longshoremen in an action involving racial discrimination in the workplace. This litigation is referred to throughout as the Jefferies case.
¶ 5 The Jefferies case began in 1995 when several longshoremen approached Perryman and his company, Consultants Confidential. Most of the eventual Jefferies plaintiffs signed an agreement with Perryman under which they would pay his company $5,000 to prepare a racial discrimination lawsuit for presentation to the United States Department of Justice. The longshoremen also agreed that Perryman would act as their representative throughout the case, and in return they would pay Perryman and his company "10% of the total final settlement" plus preapproved travel expenses. Association Ex. 36, at 1; Finding of Fact (FOF) 2.
¶ 6 The Jefferies plaintiffs were members of different local unions whose practices varied. Some of the Jefferies plaintiffs worked in Seattle and some in Tacoma, and the plaintiffs were registered at different levels and they held different jobs. While they shared broad goals, their individual issues, needs, and claims were different.
¶ 7 In December 1996, Mark Wheeler maintained workspace in Marshall's law offices.[1] Perryman approached Wheeler and asked him to look into the longshoremen's *865 case. Wheeler referred the case to Marshall, who became the lead attorney, but Wheeler also continued to work on the case. Marshall's firm filed the Jefferies case in federal district court in December 1996.
¶ 8 Around the same time, Marshall, Wheeler, and Perryman met to discuss Perryman's fee. Perryman testified that he suggested that he void the 10 percent agreement with the plaintiffs and instead work for Marshall on the case for $200 per hour. Perryman claims Marshall rejected this offer and instead agreed to charge the clients a contingency fee of 40 percent. Marshall would then give Perryman 10 percent of any recovery. At a January 1997 meeting with the plaintiffs,[2] Marshall distributed a "`Contingency Fee Agreement'" form. FOF 10. The form stated, in part:
Attorneys will receive an attorney fee of thirty three and one third percent (33 1/3%) [f]orty percent (40%) of all sums recovered by settlement or trial. . . . The attorney fee will be calculated before deduction of costs. If there is no recovery, no attorney fee will be paid.
Association Ex. 19, at 1; see also FOF 10-11.
¶ 9 In 1998, the Jefferies case went to trial. Several of the plaintiffs' claims were dismissed, including one against the International Longshoremen's and Warehousemen's Union, Local 98 (Local 98). After 10 days of testimony, the trial judge strongly encouraged the parties to settle. The parties began mediation with a different federal judge. After several days, the parties came to an agreement and 14 of the 15 plaintiffs settled. The remaining plaintiff opted out and eventually recovered nothing. Two of the other 14 plaintiffs elected to have the trial judge resolve promotion issues outside of the settlement.
¶ 10 The plaintiffs agreed to waive claims and dismiss pending appeals against the remaining defendants (not including Local 98, which had been dismissed), in exchange for $800,000. Marshall retained slightly less than 30 percent of the settlement for attorney fees, and he charged the plaintiffs over $100,000 in costs. Perryman initially asked Marshall to pay him $80,000 or 10 percent of the settlement, but at Marshall's urging, Perryman reduced his fee to $70,000 plus $1,459 in costs he had incurred. Perryman and several Jefferies plaintiffs assert that Marshall attempted to cover up this fee sharing by directing Perryman to create an hourly invoice and by telling the plaintiffs not to discuss the arrangement.
¶ 11 Marshall later appealed the district court's dismissal of some of the claims, including the claims against Local 98. In November 1999, the Ninth Circuit reversed the federal district court's dismissal of Local 98 from the Jefferies case. This appeal reinstated claims of four Jefferies plaintiffs. Local 98 offered to settle this portion of the case for $10,000. Marshall explained that he tried to contact the four affected plaintiffs, but some did not respond. Marshall did talk with one plaintiff who expressed surprise and explained that he was now working within the union, and he did not want to go forward with his remaining claim. None of the affected plaintiffs pursued their revived claim against the Local 98. Marshall eventually sued these clients to recover fees under the theory that had they pursued their remaining claim, Marshall would have recovered under the contingency fee agreement. These plaintiffs settled with Marshall, collectively paying him $8,000.
¶ 12 Marshall has explained that during the course of the Jefferies case and in the years immediately after, he moved his offices several times. He asserts that during one of the moves, a young intern accidentally disposed of some Jefferies file boxes, rather than moving them to storage for safekeeping. Marshall claims that he is now missing correspondence, client waivers, and accounting records from the Jefferies file.
¶ 13 In December 2001, three Jefferies plaintiffs filed a grievance against Marshall. In 2002, the Association charged Marshall with 10 counts of misconduct, most of which arose out of Marshall's handling of the Jefferies *866 case. The Association charged Marshall with violating the Rules of Professional Conduct (RPCs) by fee sharing, dishonestly concealing the fee sharing agreement, improperly inflating costs by more than $50,000, failing to maintain complete records or provide an accurate settlement accounting, failing to discuss with his clients the benefits and risks of multiple representation, failing to secure his clients' written consent to multiple representation, and filing an appeal without proper consultation with his clients and without their approval.[3] After a 10-day hearing, the hearing officer found that the Association proved these violations by a clear preponderance of the evidence and that Marshall acted knowingly with regard to all proven counts. The hearing officer found five aggravating factors but no mitigating factors, and he recommended a two-year suspension followed by a one-year probationary period. He also recommended that Marshall be ordered to pay restitution in the amount of $82,487.98.
¶ 14 The Board modified some of the hearing officer's findings of fact, most significantly by finding that Marshall acted intentionally when he entered into the fee arrangement with Perryman and then directed Perryman to create an hourly invoice to conceal the arrangement. The Board also found that Marshall acted intentionally when he improperly retained several thousand dollars that he had overcharged his clients in costs, even after a client brought the error to his attention. The Board agreed there were five aggravating factors and no mitigating factors, and recommended disbarment. The Board also recommended restitution in the amount of $50,473.75.[4]
¶ 15 Marshall now challenges several of the hearing officer's and Board's findings of fact. In addition, Marshall claims the Association's amended formal complaint did not give him adequate notice of the charges against him, violating his due process rights. He also challenges one of the hearing officer's evidentiary rulings. Finally, he asserts that, at most, the appropriate sanction for his misconduct is reprimand.

II

Analysis

Standard of Review
¶ 16 This court bears the ultimate responsibility for lawyer discipline in Washington. In re Disciplinary Proceeding Against Cohen (Cohen II), 150 Wash.2d 744, 753-54, 82 P.3d 224 (2004). However, we give considerable weight to the hearing officer's findings of fact. E.g., In re Disciplinary Proceeding Against Whitt, 149 Wash.2d 707, 717, 72 P.3d 173 (2003). Unchallenged findings of fact are treated as verities on appeal. In re Disciplinary Proceeding Against Longacre, 155 Wash.2d 723, 735, 122 P.3d 710 (2005). Where challenged, we will uphold the hearing officer's findings if they are supported by substantial evidence. In re Disciplinary Proceeding Against Poole, 156 Wash.2d 196, 208, 125 P.3d 954 (2006). Substantial evidence is evidence sufficient "`to persuade a fair-minded, rational person of the truth of a declared premise.'" Id. at 209 n. 2, 125 P.3d 954 (internal quotation marks omitted) (quoting In re Disciplinary Proceeding Against Bonet, 144 Wash.2d 502, 511, 29 P.3d 1242 (2001)). "`[W]e ordinarily will not disturb the findings of fact made upon conflicting evidence.'" Longacre, 155 Wash.2d at 736, 122 P.3d 710 (quoting In re Disciplinary Proceedings Against Miller, 95 *867 Wash.2d 453, 457, 625 P.2d 701 (1981)). We also give great weight to the hearing officer's evaluation of the credibility and veracity of witnesses. Longacre, 155 Wash.2d at 735, 122 P.3d 710; Whitt, 149 Wash.2d at 717, 72 P.3d 173.
¶ 17 The Association must prove misconduct by a clear preponderance of the evidence. Poole, 156 Wash.2d at 209, 125 P.3d 954. The clear preponderance standard requires more proof than simple preponderance, but less than beyond a reasonable doubt. Id. The hearing officer's ultimate conclusion that misconduct occurred should be upheld on review if it is supported by substantial evidence in the record that the lower court could reasonably have found would meet the clear preponderance standard. See Bay v. Estate of Bay, 125 Wash. App. 468, 475, 105 P.3d 434 (2005) (citing In re Det. of LaBelle, 107 Wash.2d 196, 209, 728 P.2d 138 (1986)). Our substantial evidence review should therefore take into account the clear preponderance burden of proof. We review conclusions of law de novo and will uphold them if they are supported by the findings of fact. E.g., Cohen II, 150 Wash.2d at 754, 82 P.3d 224.

A. Challenges to the Findings of Fact
¶ 18 An attorney challenging findings of fact must present argument as to why the specific findings are unsupported and cite to the record to support that argument. In re Disciplinary Proceeding Against Kronenberg, 155 Wash.2d 184, 191, 117 P.3d 1134 (2005). The attorney must do more than argue his or her version of the facts while ignoring the testimony of other witnesses. Id. We will not overturn findings based simply on an alternative explanation or versions of the facts previously rejected by the hearing officer and Board. Poole, 156 Wash.2d at 212, 125 P.3d 954 (citing In re Disciplinary Proceeding Against Romero, 152 Wash.2d 124, 133, 94 P.3d 939 (2004)).
¶ 19 Fee Sharing: The Association charged Marshall with violating RPC 5.4(a), which prohibits a lawyer from sharing fees with a nonlawyer, when he paid Perryman out of his attorney fees.[5] Specifically, the hearing officer and Board found that Marshall increased his fee to 40 percent so that he could pay Perryman 10 percent and then retain 30 percent of any recovery for his own firm.
¶ 20 Marshall's explanation with regard to these charges has not been consistent, but Marshall currently asserts that the agreement between the plaintiffs and Perryman was an independent agreement that Marshall merely facilitated by paying Perryman out of the plaintiffs' settlement. We agree that the manner in which Marshall chose to pay Perryman created an appearance of fee splitting. We prefer that attorneys avoid running afoul of the rules of professional conduct by treating such agreements as independent contracts between the client and the consultant and by insisting that the clients independently pay the consultant. When an attorney agrees to pay the consultant out of his or her attorney fees he or she dangerously approaches the limits of ethical conduct. However, in this case, Marshall carried out a preexisting agreement that the clients would pay Perryman 10 percent of the settlement. Based on the hearing officer's unchallenged finding of fact to this effect, we conclude that technically no fee splitting occurred in this case.
¶ 21 The Association also separately charged Marshall with violating RPC 8.4(c), which prohibits an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, when he instructed Perryman to create an hourly invoice for Perryman's 10 percent fee. Both the hearing officer and Board concluded that the Association had proved this count. The hearing officer and Board also found that Marshall attempted to conceal the fee arrangement by insisting the plaintiffs not discuss it.
¶ 22 Marshall argues that because he did not engage in fee splitting, he had no motive to direct Perryman to create an hourly invoice. *868 He also argues that Perryman was not a credible witness. But as discussed above, Marshall would have been justified in worrying that his arrangement with Perryman could be considered fee splitting, thereby motivating him to take steps to conceal the arrangement.
¶ 23 As for Perryman's credibility, the clients confirm his testimony that Marshall was seeking to conceal the arrangement. Moreover, both the hearing officer and Board found that Marshall's testimony on the subject was not credible. We give great weight to the hearing officer's evaluation of the credibility and veracity of witnesses, and obviously, the hearing officer believed Perryman over Marshall. Longacre, 155 Wash.2d at 735, 122 P.3d 710; Whitt, 149 Wash.2d at 717, 72 P.3d 173. We decline to overturn the hearing officer's and Board's findings and conclusions with regard to Marshall's deceitful conduct, and we uphold count IX, the RPC 8.4(c) violation.
¶ 24 Improper Costs and Failure to Provide Proper Accounting: The settlement accounting reflected $108,122.91 in costs that were subtracted from the clients' recovery. Those costs included $9,473.75 that Marshall paid to associated and/or contract attorneys for legal work performed on the Jefferies lawsuit. This amount was in addition to the attorney fee charged by the firm. However, the fee agreement explained that any lawyer associated in the Jefferies lawsuit would be associated without additional expense to the plaintiffs. The plaintiffs did not authorize contract attorney fees to be charged as costs.
¶ 25 Marshall also admits that he improperly inflated the $108,122.91 in costs by $41,000 because of an "accounting mistake." Br. of Appellant at 62-63. Throughout the course of the litigation, the plaintiffs collectively advanced Marshall a total of $41,000 to cover costs, but some plaintiffs paid more than others to finance the lawsuit. When the parties settled, Marshall determined that the settlement money should be used to pay costs, and he returned the plaintiffs' $41,000 advance fee in the amounts that they paid. Once he obtained the settlement, Marshall charged all of the costs of the lawsuit against the settlement. The mistake arose when Marshall also considered the return of the $41,000 as a cost to be charged against the settlement. When he charged the $41,000 in payments to the plaintiffs as costs, rather than as repayments of their advance fees, Marshall inflated the costs of the lawsuit by $41,000. Put another way, Marshall neglected to credit the $41,000 deposited by plaintiffs to their account so that the return of that money would not be deducted from the settlement amount.
¶ 26 Beginning in July 1998, plaintiff Ruben Chavez and his wife Tracy began sending letters to Marshall requesting copies of their fee agreement and a detailed cost breakdown. In an August 1998 letter, Chavez brought to Marshall's attention the $41,000 accounting mistake. Even so, Marshall has never repaid his clients the $41,000.
¶ 27 The Association asserted that Marshall violated former RPC 1.5(a) (1990) by charging some attorney fees as costs and by charging excessive costs.[6] The Association also charged Marshall with violating former RPC 1.14(b)(3) and (b)(4) (2002) by failing to maintain complete receipt and disbursal records concerning the $800,000 settlement, by failing to provide clients with a complete and correct accounting of the settlement funds once his client demanded it, and by failing to remit all money owed to his clients.
¶ 28 The hearing officer found that under the written contingency fee agreement, Marshall was entitled to 40 percent of the settlement, or $320,000. Under the verbal agreement among Marshall, Perryman, and the plaintiffs, Marshall was entitled to 30 percent of the settlement, or $240,000. The hearing officer found that Marshall actually charged his clients $234,000 in attorney fees. However, the Board rewrote finding of fact 60, *869 finding instead that Marshall charged $305,459[7] in attorney fees, but he intentionally split his fee with Perryman, retaining approximately $234,000 and disbursing $71,459.99 to Perryman. The Board concluded that Marshall violated former RPC 1.5(a) when he charged $9,473.75 in contract attorney fees as costs and when he mistakenly charged the $41,000 as costs and then refused to refund that money. In contrast, the hearing officer concluded that the $9,473.75 charge did not violate former RPC 1.5 because Marshall could have legitimately charged those fees under the written 40 percent contingency fee agreement.
¶ 29 Marshall alleges that the Board's findings on the former RPC 1.5 violations are not supported by the record. He claims that he is entitled to the 40 percent fee and that because the $9,473.75 and $41,000 do not raise his fee over 40 percent, he is entitled to keep those funds. However, the clients agreed to a 40 percent fee out of which Perryman would be paid. After Perryman was paid, Marshall was entitled under the fee agreement to keep $240,000 (30 percent).[8]
¶ 30 It can be a violation of former RPC 1.5 to charge fees or costs outside of the fee agreement. See, e.g., In re Disciplinary Proceeding Against Vanderbeek, 153 Wash.2d 64, 84-85, 101 P.3d 88 (2004). Here the contract attorney fees were improperly charged as costs in violation of the fee agreement, which stated that any lawyer associated with the lawsuit would be associated without additional cost to the clients. We conclude that the Board's findings accurately reflect the fee agreement and the charges in this case. We also conclude that the Marshall firm was entitled to keep $240,000 in attorney fees after Perryman was paid. The firm kept $234,000 plus the $9,473.75 for its contract attorneys, or $243,473.75. Marshall therefore retained $3,473.75 more in attorney fees than was agreed by his clients. Therefore, the former RPC 1.5 violation is supported by substantial evidence in the record.
¶ 31 Moreover, Marshall now admits that he improperly inflated the costs of the lawsuit by $41,000. Given that Marshall has already exceeded the agreed amount in attorney fees, he has no entitlement to the $41,000. Continued retention of those funds violates former RPC 1.5(a), which prohibits excessive fees, and former RPC 1.14(b)(4), which requires an attorney to promptly remit to a client funds he or she is entitled to receive.
¶ 32 The hearing officer and Board also concluded that Marshall violated former RPC 1.14(b)(3), requiring that an attorney keep complete records of all funds and other properties of the client in the possession of the lawyer and provide proper accounting. Marshall alleges that despite his mistakes in accounting, he maintained adequate records and produced them for Chavez on demand. However, Marshall does not deny that he has been unable to produce complete client registers, check registers, general account files, or appropriate backup documentation for the expenses he claimed in the Jefferies case. Instead he asserts that his records were unintentionally destroyed, but this question goes to state of mind rather than whether former RPC 1.14 was violated. As discussed in Poole, 156 Wash.2d at 217-18, 125 P.3d 954, former RPC 1.14(b)(3) imposes a duty to provide accurate accounting, something that Marshall failed to do even after Chavez called to his attention the $41,000 mistake and the $9,473.75 inappropriate charge to costs. There is substantial evidence supporting the challenged findings regarding costs, even in light of the clear preponderance standard.
¶ 33 Conflict of Interest: The Association charged that Marshall violated former RPC 1.7(b) (1995) by representing the longshoremen without explaining to each of them the implications of the common representation and the advantages and risks involved and by *870 failing to obtain written consent to multiple representation from one or more of the longshoremen. Former RPC 1.7(b) requires that:
A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client . . . unless:
(1) The lawyer reasonably believes the representation will not be adversely affected; and

The client consents in writing after consultation and a full disclosure of the material facts (following authorization from the other client to make such a disclosure). When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
(Emphasis added.) The rule assumes that multiple representation will necessarily require consultation and consent in writing, reasonably so since the rule imposes these requirements anytime there is potential conflict.
¶ 34 The hearing officer and Board concluded that this count was proved. Absent copies of the waiver forms that Marshall claims to have obtained, this count comes down to a credibility contest between Marshall and his clients. At least three of the Jefferies plaintiffs assert that Marshall did not discuss with them potential conflicts of interest or problems that might be associated with multiple representation. Three clients say they do not recall signing conflict waiver forms. Another says he thinks he signed a conflicts form, but if he did, it was never explained to him and he had very little time to review it. At least three Jefferies plaintiffs assert Marshall never met one-on-one with them about the case, and discussions of their claims occurred in a round table fashion. Marshall's cocounsel, Wheeler, did not recall any conflicts waiver forms, and the hearing officer and Board found Marshall's testimony regarding the waiver forms was not credible.
¶ 35 Marshall and the dissent claim that there could be no conflict of interest here because the plaintiffs' interests were aligned. However, the hearing officer and Board found that while they shared broad goals, including elimination of racial discrimination in the longshore industry, their individual issues, needs, and claims were different. More importantly, we have recognized that former RPC 1.7(b) applies even absent a direct conflict. In re Disciplinary Proceeding Against Egger, 152 Wash.2d 393, 412, 98 P.3d 477 (2004). Marshall himself testified that there are potential conflicts whenever multiple representation occurs. There was a risk that Marshall would not be able to simultaneously abide by all of his clients' wishes when conflicts arose among the plaintiffs. The Association also notes that the "strength in numbers" strategy could work to the benefit of some, but to the detriment of others. Even if Marshall reasonably believed that his representation of all of the Jefferies clients would not be adversely affected, Marshall had a duty to explain to each client "the implications of the common representation and the advantages and risks involved" and to get consent in writing from each. Former RPC 1.7(b)(2). The dissent ignores the plain language of the rule.
¶ 36 There is substantial evidence in the record to support the hearing officer's and Board's findings regarding Marshall's violation of former RPC 1.7(b). To the extent that the dissent asserts that there was no actual conflict in this case, it forgets that the rule requires full disclosure of potential conflicts and written consent of the client where multiple representation may materially affect the client's case. Former RPC 1.7(b).
¶ 37 Ninth Circuit Appeal: The Association charged Marshall with violating former RPCs 1.2(a), 1.2(f), and 1.4(b) (2002) by filing the Jefferies appeal without his clients' permission, by failing to abide by their wishes regarding such representation, and by failing to inform them of the consequences of such an appeal. The hearing officer and Board concluded that these charges were proved.
¶ 38 Former RPC 1.2(a) imposes a duty to "abide by a client's decisions concerning the objectives of representation . . . and . . . consult with the client as to the means by which *871 they are to be pursued." Former RPC 1.2(f) prohibits a lawyer from "willfully purport[ing] to act as a lawyer for any person without the authority of that person." Former RPC 1.4(b) requires a lawyer to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." There is evidence in the record showing that at least two of the plaintiffs involved in the appeal did not agree to or authorize the appeal.
¶ 39 Marshall primarily cites to his own testimony to support his argument that the appeal was authorized, and where he cites to something other than his own testimony, the evidence is irrelevant or weak. For example, one client testified that he received the relevant notice of appeal in the mail, but the appeal did not impact that particular client. Moreover, former RPCs 1.2(a) and 1.4(b) contemplate more than mailing the notice of appeal to the client after the fact. Similarly, Marshall cites a letter in the record in which he refers to the appeal in passing, but an unchallenged finding of fact establishes that the June 1998 letter "did not meaningfully inform the plaintiffs of the purpose of the appeal, its impact on each of them as individuals or its consequences in the event that they chose not to continue to litigate against Local 98." FOF 32. Given our deference to the finder of fact and our reluctance to overturn factual findings based on a recitation of the attorney's version of events, Poole, 156 Wash.2d at 212, 125 P.3d 954, we conclude that there is substantial evidence in the record to support the findings that at least two clients did not authorize the appeal. Marshall himself explains that the clients' improved relationships with Local 98 may have led them to forego an appeal. In light of the evidence in the record, we decline to overturn the factual findings relating to the Ninth Circuit appeal.
¶ 40 In sum, we hold that for the most part there is sufficient evidence in the record to support the challenged findings of fact, even in light of the clear preponderance standard. We depart from the hearing officer and Board only by concluding that, based on the preexisting agreement between Perryman and the clients, technically no fee splitting occurred in this case. We therefore overturn count VIII.

B. Due Process
¶ 41 Marshall claims that the Association did not satisfy due process because it did not specifically charge that he knowingly filed the Ninth Circuit appeal without permission from his clients, and it did not allege several specific facts found by the hearing officer to support the former RPC 1.7 conflicts violation.[9] Marshall also claims that he did not know disbarment was a potential sanction for his alleged misconduct.
¶ 42 ELC 10.3(a)(3) explains, "[t]he formal complaint must state the respondent's acts or omissions in sufficient detail to inform the respondent of the nature of the allegations of misconduct." Due process requires that the attorney "be notified of clear and specific charges and . . . be afforded an opportunity to anticipate, prepare, and present a defense." Romero, 152 Wash.2d at 136-37, 94 P.3d 939. But once misconduct is found, analysis of the appropriate sanction under the American Bar Association's Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) (Standards) does not violate an attorney's due process rights. Id. at 137, 94 P.3d 939 (citing with approval In re Disciplinary Action Against Gherity, 673 N.W.2d 474, 479 (Minn.2004) (allowing disbarment where the bar complaint sought only "`appropriate discipline'")).
¶ 43 In this case Marshall was charged with violating former RPC 1.7(b) by engaging in multiple representation in the Jefferies case without discussing the benefits and risks with his clients or getting their consent in writing. The amended formal complaint asserts that the alleged misconduct subjects Marshall to "disciplinary action; probation; restitution[;] and assessment of *872 the costs and expenses of these proceedings." Clerk's Papers at 35. ELC 13.1 is abundantly clear that disciplinary action includes disbarment, suspension, reprimand, or admonition. From the complaint, Marshall could discern what the charges were, which of his cases was involved, and the factual basis for the charges. He was also notified of the potential consequences.
¶ 44 In addition, the Association's hearing brief provided a sanction analysis in which the Association specifically claimed that Marshall acted knowingly with regard to the Ninth Circuit appeal, and the Association sought suspension for this misconduct. In the same brief, the Association sought disbarment for several other counts including the fee-splitting, conflicts violations, and underlying dishonesty. Marshall's counsel acknowledged very early in the hearing that disbarment was a possible sanction. Thus, Marshall had actual notice of the state of mind alleged and the fact that the Association was seeking disbarment.
¶ 45 To the extent that Marshall attempts to equate this case with the due process violation discussed in In re Ruffalo, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968), that case is distinguishable. In Ruffalo, the original charges served as a trap, lulling the attorney into presenting evidence that assured disbarment under new charges filed after the attorney and his witnesses had already testified. Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 655 n. 18, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (describing Ruffalo). The very evidence that Ruffalo put on in defense of the original charges became, under revised charges, inculpatory. Id. But here, all of the specific facts supporting the hearing officer's findings were elicited from testimony occurring in the Association's case in chief, after which Marshall had an opportunity to present his defense. The Ruffalo trap simply did not occur here. We therefore hold that the amended formal complaint stated Marshall's acts or omissions in sufficient detail to inform Marshall of the nature of the allegations of misconduct, and we conclude that no due process violation occurred.

C. Evidentiary Challenge
¶ 46 At the disciplinary hearing, Wheeler testified that Perryman had also filed a complaint against him with the Association. Wheeler explained that the complaint, which arose out of Collins, another longshore discrimination case, was dismissed after the Association found no violation. The hearing officer ruled that this testimony was admissible for impeachment purposes only. Marshall challenges this ruling, arguing that the testimony should have been admitted as substantive evidence because it was relevant to an argument that the Association engaged in selective prosecution when it pursued charges of fee sharing against Marshall, but dismissed similar allegations against Wheeler.
¶ 47 This court reviews evidentiary rulings for abuse of discretion. See, e.g., Cox v. Spangler, 141 Wash.2d 431, 439, 5 P.3d 1265 (2000). In disciplinary hearings, evidence is admissible if the hearing officer determines it is "the kind of evidence on which reasonably prudent persons are accustomed to rely" and not irrelevant, immaterial, or unduly repetitious. ELC 10.14(d)(1). The hearing officer may also refer to the Washington Rules of Evidence, see ELC 10.14(d)(2), which explain that relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." ER 401. In the instant case, the hearing officer did not abuse his discretion in limiting the use of Wheeler's testimony. The testimony is irrelevant for purposes of proving selective prosecution because the grievance against Wheeler is distinguishable. The circumstances of the Collins case are different from the circumstances here. Marshall himself testified that the Collins case was dismissed on summary judgment and the plaintiffs recovered nothing. Under those circumstances, contingency payment to Perryman like that found by the hearing officer and Board in this case could not have occurred in Collins. The hearing officer did not abuse his discretion in limiting this testimony to use for impeachment purposes.

*873 D. Sanction
¶ 48 The Standards govern lawyer sanctions in Washington. Cohen II, 150 Wash.2d at 758, 82 P.3d 224. According to the Standards, we first evaluate whether the Board properly determined the presumptive sanction by considering (1) the ethical duties violated, (2) the lawyer's mental state, and (3) the actual or potential injury caused by the lawyer's misconduct. Id.; see also Standards std. 3.0(a)-(c). Next we consider aggravating and mitigating circumstances. Standards std. 3.0. Finally, we determine whether the degree of unanimity among board members and the proportionality of the sanction justify departure from the Board's recommendation. In re Disciplinary Proceeding Against Kuvara, 149 Wash.2d 237, 259, 66 P.3d 1057 (2003).
¶ 49 Where sanction recommendations differ, we will generally give more weight to the Board's sanction recommendation than the hearing officer's. Cohen II, 150 Wash.2d at 754, 82 P.3d 224. Although we are not bound by the Board's recommendation, "[w]e should not lightly depart from recommendations shaped by [the Board's] experience and perspective." In re Disciplinary Proceeding Against Noble, 100 Wash.2d 88, 94, 667 P.2d 608 (1983). We generally affirm the Board's recommended sanction unless we can "`"articulate a specific reason to reject [it]."'" Poole, 156 Wash.2d at 209-10, 125 P.3d 954 (quoting In re Disciplinary Proceeding Against Guarnero, 152 Wash.2d 51, 59, 93 P.3d 166 (2004) (quoting In re Disciplinary Proceeding Against McLeod, 104 Wash.2d 859, 865, 711 P.2d 310 (1985))). However, a recommendation from a divided Board deserves less weight. In re Disciplinary Proceeding Against Whitney, 155 Wash.2d 451, 469, 120 P.3d 550 (2005).

Presumptive Sanction
¶ 50 Concealment of the Fee Arrangement: Standard 5.1 governs an attorney's failure to maintain personal integrity in a situation where the attorney seeks to deceive someone other than the court or his client. Standards std. 5.1 (governing "conduct involving dishonesty, fraud, deceit, or misrepresentation.").[10] Under standard 5.11, disbarment is generally appropriate where a lawyer engages in serious criminal conduct[11]or intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice. Standards std. 5.11. In comparison, suspension is generally appropriate where a lawyer knowingly engages in less serious criminal conduct involving dishonesty, while reprimand is generally appropriate where a lawyer knowingly engages in any other conduct involving dishonesty that adversely reflects on the lawyer's fitness to practice law. Standards stds. 5.12-5.13. The Standards defines intent as a "conscious objective or purpose to accomplish a particular result." Standards Definitions at 7. Knowledge is the "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." Id. Negligence is the "failure . . . to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." Id.
¶ 51 The hearing officer found that Marshall acted knowingly when he instructed Perryman to craft an hourly invoice. The Board departed from the hearing officer because it believed Marshall intentionally instructed Perryman to submit a false invoice to conceal the fee splitting arrangement. At this court, Marshall argues that he acted only negligently and that the Jefferies plaintiffs suffered no harm from his conduct.
*874 ¶ 52 In fact, the hearing officer's own findings of fact reflect that Marshall instructed Perryman to create the hourly invoice with the intent of concealing the fee arrangement. Instructing Perryman to create a false invoice in order to conceal the true fee arrangement was a calculated act, and we agree with the Board that he acted intentionally. With regard to harm, at the very least, Marshall's dishonesty adversely reflects on his fitness to practice, especially in light of the fact that he had previously been disciplined for directing his staff to "emulate" a client's signature on a document that was then submitted to a court. Hr'g Officer's Conclusion of Law 94; Board Op. ¶ 90. Even if the level of harm resulting from the dishonest conduct does not seriously, adversely reflect on his fitness to practice, reprimand under standard 5.13 is inappropriate because Marshall acted intentionally. Because Marshall's state of mind points to disbarment, but the level of harm points to reprimand, we conclude that under standard 5.1, the presumptive sanction for these charges should be the intermediate consequence, suspension.
¶ 53 Overcharging Costs: The hearing officer and Board agree that standard 4.12 applies to these instances of misconduct. Standard 4.12 provides that suspension is appropriate when a lawyer knows or should know that he is dealing improperly with client property and he causes injury or potential injury to the client. Marshall argues that he did not realize that he improperly inflated his costs by $41,000, but standard 4.12 also applies where a lawyer should know he is dealing improperly with client funds. Moreover, Marshall has continued to retain the $41,000 in the face of notice that he made an accounting error. And while Marshall argues that there was no harm because he was entitled to keep the $41,000 under his 40 percent contingency fee agreement, he forgets that he and the plaintiffs agreed that Perryman would be paid out of the 40 percent, reducing his remaining share to $240,000.
¶ 54 The Association asserts that Marshall acted intentionally in order to benefit himself when he retained the $41,000 and that doing so caused serious injury, subjecting Marshall to disbarment under standard 7.1. While the hearing officer found that Marshall acted only knowingly, the Board found Marshall acted intentionally when he retained the funds even after a client raised the accounting error. Interestingly, the Board still concluded that standard 4.12 provided the presumptive sanction. While we agree with the Board that Marshall acted intentionally when he retained the $41,000, we also note that the Board did not see fit to raise the presumptive sanction to disbarment here. Therefore, we defer to the Board and conclude that suspension should be the presumptive sanction for these counts.
¶ 55 Potential Conflict: Both the hearing officer and the Board agreed that standard 4.32 applies to this count. We have applied this standard in cases where an attorney knowingly violated former RPC 1.7(b). See Egger, 152 Wash.2d at 416, 98 P.3d 477. In challenging this presumptive sanction, Marshall merely restates his version of the facts. See Kronenberg, 155 Wash.2d at 191, 117 P.3d 1134. He also argues that he was merely negligent in failing to recognize any conflicts. But Marshall testified that he understood that multiple representation presented potential conflicts, triggering the need for a waiver. Marshall has not overcome our deference to the hearing officer with regard to the finding of state of mind or level of harm. Suspension is the presumptive sanction for this count.
¶ 56 Unauthorized Appeal: The hearing officer and Board agreed that standard 4.42(a) applies where Marshall failed to get authorization from his clients before pursuing the Ninth Circuit appeal. In contesting this presumptive sanction, Marshall merely reargues his version of the facts with regard to his state of mind, asserting that his letters to plaintiffs mentioning the appeal were sufficient. With regard to harm, he ignores the fact that the plaintiffs were required to pay for an appeal that they did not authorize. Again, suspension is the presumptive sanction for this count.
¶ 57 Where multiple instances of misconduct have occurred, the overall presumptive sanction should at least be consistent *875 with the sanction for the most serious offense. In re Disciplinary Proceeding Against Schwimmer, 153 Wash.2d 752, 758-59, 108 P.3d 761 (2005). In this case, the presumptive sanction is disbarment.

Aggravating and Mitigating Factors
¶ 58 The hearing officer and Board agreed that five aggravating factors apply in this case. Marshall had substantial experience in the practice of law, this case involved multiple offenses, Marshall refused to acknowledge the wrongful nature of his conduct, and Marshall exhibited indifference to making restitution. In addition, Marshall had prior disciplinary offenses, including a 1989 admonition for making a misrepresentation and failing to cooperate with an Association investigation and a 1998 reprimand for directing his staff to "`emulate'" signatures of two declarants and then knowingly filing the declarations with the court. Hr'g Officer's Conclusion of Law 94; Board Op. ¶ 90. The hearing officer and Board found no mitigating factors.
¶ 59 Marshall argues that his prior disciplinary offenses are too remote and irrelevant to be considered, but Marshall's direction to "emulate" declarant signatures is similar to his direction to Perryman to create a false hourly invoice. With regard to his indifference to restitution, Marshall again simply reargues his version of the facts. Marshall also contends that refusal to acknowledge the wrongful nature of his conduct should not be considered because it punishes him for asserting his innocence. See Kronenberg, 155 Wash.2d at 196 n. 8, 117 P.3d 1134. Yet we have recently applied this factor, Poole, 156 Wash.2d at 224, 125 P.3d 954, and here the issue is not adequately briefed for us to eliminate this aggravating factor altogether. At least arguably, an attorney's unwillingness to acknowledge that certain misconduct amounted to a violation of the RPCs speaks to the likelihood of future harm to the public. In sum, all of the aggravating factors found by the hearing officer and the Board continue to apply.
¶ 60 Marshall asserts that he is entitled to three mitigating factors. First he claims that he acted with no dishonest or selfish motive. But the act of directing Perryman to create an hourly invoice to conceal the fee sharing agreement is by its very nature dishonest. Marshall also asserts that there has been interim rehabilitation, but, in light of the 1992 amendments to the Standards, we have recognized interim rehabilitation only in instances where the attorney is recovering from mental disability or chemical dependency. In re Disciplinary Proceeding Against Christopher, 153 Wash.2d 669, 685, 105 P.3d 976 (2005).[12]
¶ 61 Finally, Marshall asserts that he is entitled to mitigation based on his character and reputation, referring to letters submitted on his behalf in his interim suspension proceeding. The Association moved to strike the reference to the letters because they are outside the record on review. But ultimately, whether or not we adopt this factor is inconsequential because it is not enough to alter the sanction in light of the long list of aggravating factors. In re Disciplinary Proceeding Against Dynan, 152 Wash.2d 601, 622 n. 26, 98 P.3d 444 (2004).[13]

Unanimity and Proportionality
¶ 62 Finally, we must consider whether the degree of unanimity among the Board and *876 proportionality of the sanction justify departure from the Board's disbarment recommendation. Kuvara, 149 Wash.2d at 259, 66 P.3d 1057. A recommendation from a divided Board deserves less weight than we ordinarily give to the Board's sanction recommendation. Whitney, 155 Wash.2d at 469, 120 P.3d 550. Here the Board was divided 7-6 on the issue of sanction, with six members opposing disbarment.
¶ 63 When evaluating the proportionality of the recommended sanction, we consider other similar cases in which the same sanction was approved or disapproved. Cohen II, 150 Wash.2d at 763, 82 P.3d 224. The attorney bears the burden of showing that the Association's recommended sanction is disproportionate. In re Disciplinary Proceeding Against Kagele, 149 Wash.2d 793, 821, 72 P.3d 1067 (2003).
¶ 64 Marshall points to several cases of disbarment which arguably involve more severe misconduct than his own. For example, VanDerbeek charged patently unreasonable fees to numerous clients, and Romero charged numerous court appointed clients improper fees and costs, where here Marshall's fee violation occurred in a single case. Vanderbeek, 153 Wash.2d at 72-73, 101 P.3d 88; Romero, 152 Wash.2d at 128-30, 94 P.3d 939. We recently disbarred an attorney where the hearing officer found that he knowingly misused client funds by writing checks out of his IOLTA[14] account for his own benefit. Schwimmer, 153 Wash.2d at 759, 108 P.3d 761. Similarly, Whitt intentionally provided false information and fabricated documents during the bar's investigation of her misconduct. Whitt, 149 Wash.2d at 719, 72 P.3d 173.
¶ 65 In cases more similar to Marshall's, this court has imposed suspensions. For example, in Egger, we imposed a six-month suspension where the attorney billed his client $15,000 in legal fees that had already been paid by another party. Egger also violated former RPC 1.7 by failing to get the client's written consent where potential conflicts existed. See Egger, 152 Wash.2d at 420, 98 P.3d 477. In In re Disciplinary Proceeding Against Brothers, 149 Wash.2d 575, 580, 70 P.3d 940 (2003), we imposed a one-year suspension where attorney unreasonably charged over $36,000 for the simple task of preparing a quitclaim deed. And in In re Disciplinary Proceeding Against Cohen (Cohen I), 149 Wash.2d 323, 330, 67 P.3d 1086 (2003), we imposed a six-month suspension where the attorney, among other things, filed an appeal without notice to his clients. See also In re Disciplinary Proceeding Against DeRuiz, 152 Wash.2d 558, 562, 99 P.3d 881 (2004) (one-year suspension for multiple violations including failure to communicate and failure to remit unreasonable fees); In re Disciplinary Proceeding Against Tasker, 141 Wash.2d 557, 560, 9 P.3d 822 (2000) (two-year suspension where lawyer commingled funds in his trust account and paid business and personal expenses out of the trust account to avoid child support payments but no client lost money); In re Disciplinary Proceeding Against Boelter, 139 Wash.2d 81, 106-07, 985 P.2d 328 (1999) (six-month suspension where the lawyer billed unreasonable fees and then threatened to reveal client confidences in a suit to collect those fees); In re Disciplinary Proceeding Against Haskell, 136 Wash.2d 300, 305, 308-09, 322, 962 P.2d 813 (1998) (two-year suspension where lawyer switched initials on billing statements and stole modest amounts from clients by charging improper costs).
¶ 66 Because we have overturned the fee splitting count, the presumptive sanction is now suspension, rather than disbarment. In addition, Marshall's violations occurred in the context of a single case. He improperly retained funds that belonged to his clients, but the Association was unable to prove that the original accounting error was more than a mistake. We conclude that suspension, rather than disbarment is appropriate here. Even so, a comparatively long suspension is warranted by the multiple violations and the fact that aggravating factors far outweigh mitigating ones. In re Disciplinary Proceeding Against Haley, 157 Wash.2d 398, 411-12, 138 P.3d 1044 (2006); Longacre, 155 Wash.2d at 746-47, 122 P.3d 710; Cohen II, 150 Wash.2d at 764, 82 P.3d *877 224. We therefore impose an 18-month suspension.
¶ 67 A lawyer subject to discipline may be ordered to make restitution to persons financially injured by the lawyer's conduct. Longacre, 155 Wash.2d at 747, 122 P.3d 710. We also conclude that Marshall must pay restitution to his clients in the amount of the $41,000 he overcharged for costs and the $3,473.75 he charged in excess of the $240,000 of the Jefferies settlement he was entitled to retain for attorney fees after payment to Perryman. Marshall must therefore pay restitution to his clients in the amount of $44,473.75.

III

Conclusion
¶ 68 For the most part, the challenged findings of fact are supported by substantial evidence in the record, even in light of the clear preponderance standard of review. We overturn count VIII because we find no fee splitting technically occurred. Based on the resulting presumptive sanction of suspension, the lack of unanimity supporting the Board's disbarment recommendation, and sanctions imposed in similar cases, we impose an 18-month suspension and require Marshall to pay $44,473.75 in restitution. We conclude that the amended formal complaint was sufficiently specific to satisfy due process. We also hold that the hearing officer acted within his discretion when he limited the use of Wheeler's testimony regarding his grievance.
WE CONCUR: GERRY L. ALEXANDER, C.J., TOM CHAMBERS, SUSAN OWENS, BARBARA A. MADSEN, JAMES M. JOHNSON, JJ.
SANDERS, J. (dissenting).
¶ 69 The Disciplinary Board of the Washington State Bar Association asserts Bradley Marshall failed to warn his clients of potential conflicts. The majority suspends Bradley Marshall's license to practice law for 18 months yet fails to demonstrate how Marshall's conduct actually violated the Rules of Professional Conduct. Even if we ignore the paucity of evidence and agree with the specific facts found by the board, these facts do not evidence unethical behavior. There is no finding of a specific real or potential conflict for Marshall to warn his clients about. What Marshall did was successfully settle his clients' civil rights claims, earning them nearly a million dollars. Rather than punish him, we should commend him.
¶ 70 Fourteen longshoremen sued the International Longshoremen's and Warehousemen's Union for civil rights violations. Through Marshall's advocacy, the plaintiffs settled the lawsuit for $800,000. Several plaintiffs were awarded promotions while several supervisors were punished with sensitivity training. And the internal procedures used by the union in its dispatch and grievance practices were changed to eliminate racism within the system. After the settlement, disagreements arose concerning fees and costs. The allegations before us today were made in the shadow of acrimonious disputes between Marshall and his clients. First, the clients complained about the payments to Wayne Perryman until they were reminded of their prior agreement to pay him 10 percent of any recovery. Then, after Marshall successfully appealed to the Ninth Circuit Court of Appeals, Marshall was forced to sue the clients who were parties to that appeal for costs. Those clients settled for $8,000 and then filed bar grievances against Marshall.
¶ 71 We presume any licensed and practicing attorney maintains the high morals of the profession. In re Discipline of Little, 40 Wash.2d 421, 430, 244 P.2d 255 (1952). This presumption is only rebutted when facts are proved beyond a clear preponderance of the evidence. In re Disciplinary Proceeding Against Allotta, 109 Wash.2d 787, 792, 748 P.2d 628 (1988). Indeed, we have a constitutional obligation to ensure no attorney is unduly deprived of his property or liberty interests in his professional license. Bang Nguyen v. Dep't of Health, 144 Wash.2d 516, 522 n. 4, 29 P.3d 689 (2001) ("[A] professional license represents a property interest to which due process protections apply."). Challenged findings of facts must be supported by substantial evidence, which incorporate this heightened burden of proof. In *878 re Disciplinary Proceeding Against Poole, 156 Wash.2d 196, 209, 125 P.3d 954 (2006). Nevertheless these findings cannot be conclusory, but must set forth specific facts demonstrating a clear violation of the Rules of Professional Conduct. Id. ("Thus, a clear preponderance of all the facts proved must support a finding of misconduct."). While the majority reflexively claims substantial evidence supports the bar's findings, I disagree that the actual findings, much less the evidence, even construed favorably to the bar, supports the legal conclusion Marshall either represented clients with a real or potential conflict of interest or shared his fee with a nonlawyer.
¶ 72 Former Rule of Professional Conduct 1.7(b) (1995) provides, "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client." Despite no finding of material limitations, the majority claims potential conflicts existed. Majority at 870. While a potential conflict may pose an ethical problem, such a potential conflict must be with an actual person. Neither the majority nor the bar bothers to explain where this mysterious, amorphous conflict lies. The most the Board found is while the clients "shared broad goals, including the elimination of racial discrimination in the longshore industry, their individual issues, needs, and claims were different." Id. at 870; see also Finding of Fact (FOF) 21. This proves nothing. Clients might have had different interests but unless these interests conflict there is no violation. Here there is no finding that one client's interest was in conflict with another's or that Marshall's capabilities were materially limited. The findings only discuss "potential conflicts of interests and problems associated with representing multiple plaintiffs." FOF 20.
¶ 73 We have found conflicts when an attorney represents a party with opposite interests to a client, a third party, or himself. See In re Disciplinary Proceeding Against McKean, 148 Wash.2d 849, 64 P.3d 1226 (2003); Eriks v. Denver, 118 Wash.2d 451, 460, 824 P.2d 1207 (1992). But here the parties' interests were aligned. See Schneider v. Snyder's Foods, Inc., 116 Wash.App. 706, 709, 66 P.3d 640, 642 (2003) (multiple plaintiffs from nine separate locals of the Teamsters Union sued their employer in a single lawsuit). Every client had been discriminated against and each had claims stemming from civil rights abuses.
¶ 74 Where is the conflict? Neither the Board nor the majority tells us. The plaintiffs originally planned to proceed as a class-action. They had only six months to bring a case after the Equal Employment Opportunity Commission issued right to sue letters. Instead of seeking counsel independently, the longshoremen, as a group, directed Perryman to find an attorney to bring their case. The results wrought by Marshall's work were to the benefit of all; there were no potential conflicts and there was no violation of former RPC 1.7(b).[1]
¶ 75 Marshall zealously and effectively advocated for his clients. He should be applauded for his advocacy, rather than maligned with these accusations. Both the bar and the majority fail to connect Marshall's actions with any violation of the Rules of Professional Conduct regarding allegations of conflicts of interest.
¶ 76 I dissent.
WE CONCUR: CHARLES W. JOHNSON, J., MARY KAY BECKER, Justice Pro Tem.
NOTES
[1] It is unclear whether Wheeler was an employee of the firm or merely sharing office Space at that time.
[2] Marshall explained that the suit was filed before the first client meeting because the statute of limitations was about to expire.
[3] The Association voluntarily dropped two additional counts and the hearing officer found the Association failed to prove two more. The Association also failed to prove portions of some of the other counts. These decisions have not been challenged.
[4] The hearing officer's and Board's restitution calculations differed. The hearing officer would have required Marshall to reimburse four clients for the $8,000 settlement amount paid to Marshall as a result of his lawsuit against them. The hearing officer also would have required Marshall to compensate those clients in the amount of $8,372 each for the attorney fees they incurred when defending themselves in that lawsuit. In contrast, the Board would not require Marshall to repay the four clients the $8,000 settlement amount or their attorney fees. However, the Board would require Marshall to repay $9,473.75 that was wrongfully charged as costs rather than attorney fees. The Association does not challenge the Board's reduction of restitution.
[5] Fee sharing is prohibited in order to protect a lawyer's professional independence of judgment in rendering services to another. See Model Rules of Prof'l Conduct R. 5.4 cmt. (2004). We also note that the payment of finders' fees injures the legal profession.
[6] The hearing officer found the Association failed to prove that Marshall violated RPC 8.4(c) (prohibiting dishonesty or misrepresentation) by charging the contract attorney fees as costs because those fees could have been charged under the 40 percent contingency fee agreement. The Board deleted this conclusion but did not impose any additional sanction as a result. The Association also failed to prove that Marshall charged personal expenses to the clients as costs. The Association does not challenge this finding.
[7] The Board's finding apparently includes a scrivener's error as to the total amount of attorney fees, reading $35,459.00 rather than $305,459.00.
[8] Perryman reduced his fee to $70,000 plus $1,459 in costs he had incurred so that the plaintiffs could retain more of the settlement. The benefit of Perryman's discount was intended to go to the clients, not Marshall.
[9] Marshall complains that the Association did not specifically allege that the Jefferies plaintiffs were members of different local unions, that Marshall used the claims of the Tacoma plaintiffs to strengthen the claims of the Seattle plaintiffs, that he did not meet separately with the plaintiffs to discuss their individual claims, or that Marshall reserved an issue for another lawsuit.
[10] The hearing officer and Board applied standard 7.0 to count IX, but because we have overturned the related count regarding fee sharing, we conclude that standard 5.1 is the more appropriate standard for the remaining count of dishonesty regarding the fee arrangement. The Jefferies clients were aware of the fee arrangement with Perryman and in fact were asked to participate in the concealment. Marshall also did not deceive a court with regard to the arrangement.
[11] Standard 5.11(a) includes a list of specific serious criminal conduct to which that standard applies.
[12] In his reply, Marshall seems to rely on an old mitigating factor of interim rehabilitation that did not reference chemical dependence or mental disability. While the on-line version of the Standards, on which Marshall apparently relies, incorrectly recites simple "interim rehabilitation" as a factor, the hard copy of the Standards shows that this factor was deleted in 1992 by the Board of Delegates. Standards Amendments to std. 9.3 (Feb.1992). In any case, Marshall's claim of interim rehabilitation must be viewed with skepticism. When we denied interim suspension, we did so on the condition that Marshall consent to supervision from another attorney. That attorney has since withdrawn as Marshall's supervisor because Marshall failed to show understanding of the RPCs as required by our order and because Marshall and the supervising attorney could not agree on the appropriate level of supervision. Letter from Supervising Att'y at 1, 3.
[13] The Association has also moved to strike from the record an unsolicited letter that an Illinois congressman wrote in support of Marshall. Unsolicited letters are not part of the record under ELC 12.5(b). This motion to strike is granted.
[14] Interest on Lawyer Trust Account.
[1] The majority also claims while Marshall did not split his fee with Mr. Perryman, he acted dishonestly by asking Perryman to prepare an invoice in order to hide what appeared to be fee-splitting. Majority at ___. Why would Marshall attempt to conceal fee-splitting if he did not split his fee? Marshall was only enforcing a legitimate agreement to ensure Perryman recovered what he was already entitled to recover. FOF 12.