

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE  APR 1 7 2014

Madsen, C.J.
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on Apr. 17, 2014

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re Disciplinary Proceeding Against | ) | No. 201,017-2 |
| ROBERT B. JACKSON, | ) | |
| | ) | En Banc |
| Attorney at Law. | ) | |
| | ) | |
| | ) | Filed   APR 1 7 2014 |

WIGGINS, J.—After an 11-day disciplinary hearing, a hearing officer concluded that Robert B. Jackson had committed 14 counts of misconduct. The presumptive sanction for 10 of the 14 counts is disbarment. Accordingly, the hearing officer recommended that Jackson be disbarred and a unanimous Washington State Bar Association Disciplinary Board (Board) agreed.

On appeal, Jackson generally assigns error to all of the hearing officer's findings of fact but fails to support any assertion with argument, legal authority, or references to the record. We hold that the hearing officer's credibility determinations and findings of fact are supported by substantial evidence and her conclusions of law are correct. There is no evidence of bias or misconduct on the part of the hearing officer or disciplinary counsel. In addition, the record supports the finding of seven aggravating factors and three mitigating factors and we hold that disbarment is not disproportionate. Thus, we accept the Board's unanimous recommendation and order Jackson disbarred.

FACTS

Robert B. Jackson was admitted to practice law in the state of Washington on November 16, 1989. This proceeding arises out of two separate matters: the Simonson matter (counts 1-5) and the Dainard matter (counts 6-14). Each matter involves thousands of pages of exhibits that, along with hours of testimony, evidence a complex web of fraud, deceit, conflicts of interest, and other serious violations of the Rules of Professional Conduct (RPC). The hearing officer made 391 detailed findings of fact. Although Jackson purports to assign error to all findings, he never argues this assignment of error. Accordingly, we treat the findings as verities on appeal. *In re Disciplinary Proceeding Against Marshall*, 160 Wn.2d 317, 329, 157 P.3d 859 (2007) (unchallenged findings of fact are verities on appeal). For context, we provide a short summary of the facts related to each matter prior to delving into the details.

I.   Simonson Matter (Counts 1-5)

In the Simonson matter, Jackson assisted his client and business partner Doug Simonson in transferring real property that had previously been abandoned in Simonson's bankruptcy. Jackson helped Simonson obtain a loan on the property by falsely signing documents as an agent of the seller (Michael Levenhagen). Later, when the bankruptcy court froze Simonson's assets in an adversary proceeding, Jackson used his lawyer trust accounts to transfer funds for Simonson, in violation of the court's orders.

Jackson then represented three other couples (the Levenhagens, Laings, and Lanings) who were sued by the bankruptcy trustee for their participation in the Simonson property transactions. Jackson did not inform these clients (1) that he was

2

personally involved in the transactions at issue, (2) that he was concurrently providing legal advice to Simonson, or (3) that his interests and those of Simonson were adverse to theirs. In response to discovery requests, Jackson intentionally withheld documents that would have assisted his clients' defense because the evidence contradicted Simonson's defenses and revealed Jackson's own culpability.

*A. The Real Estate Transaction*

In early 2004, Doug and Karen Simonson owned a residence in Kirkland, Washington. On April 27, 2004, the property was appraised for sale at $1.1 million. Two days later, the Simonsons filed a petition for bankruptcy, listing the Kirkland residence. Based on representations that the residence property had no equity beyond the secured loans, the bankruptcy court entered an order abandoning the property.

Soon thereafter, Doug Simonson, acting as an agent for Global Financial Solutions (GFS), contacted Michael Levenhagen—a potential buyer from Minnesota. GFS is a company that structures real estate investments by pairing investors with good credit with investment properties. Simonson did not tell Levenhagen that the residence property had been in bankruptcy, that he was living in it, or that he expected to receive a commission from the sale. Levenhagen purchased the property for $1 million. As part of the purchase agreement, GFS agreed to pay a buying partnership fee to Levenhagen for the use of his credit and to pay the mortgage.

GFS failed to perform on its promise. Levenhagen contacted Simonson and Simonson blamed GFS for all of the issues, casting himself as a fellow victim of GFS. When Levenhagen traveled to Washington to explore selling the residence, he

3

learned for the first time that Simonson had owned the property and that it had been involved in his bankruptcy. Simonson persuaded Levenhagen not to sell the property by telling him it did not have enough value to pay off the loans. Simonson continued to reside in the residence, while Levenhagen made the mortgage payments.

In April 2005, Simonson retained Jackson, who helped him set up and carry out a plan to transfer the residence so that it would ultimately end up back in Simonson's control while allowing Simonson to pull out cash along the way. Jackson prepared multiple documents to effectuate this complicated series of transfers.

The plan was implemented so that on June 7, 2005, Simonson transferred his ownership interest in Network Builders LLC to Levenhagen; this transfer was not recorded. Two days later, Levenhagen quitclaimed the residence to Network Builders and sent the documents to Jackson; these documents were recorded. The reason for this pair of transactions was that Simonson wished to obtain a hard money loan on the Kirkland residence even though he no longer had an ownership interest in it. To that end, Jackson drafted a real estate excise tax affidavit and signed it under penalty of perjury as Levenhagen's agent (the affidavit was necessary for quitclaim deed to be recorded). Jackson then recorded the affidavit and the quitclaim deed. By failing to record the Network Builders transfer and recording the quitclaim deed, the public record reflected that the residence belonged to Network Builders and that Network Builders was still owned by Simonson.

On June 13, 2005, Simonson obtained a $167,775.56 loan against the residence, signing the deed of trust as manager of Network Builders. Neither Jackson nor Simonson told Levenhagen that the property had been further encumbered.

4

On June 16, 2005, still unaware of the new loan against the property, Levenhagen transferred Network Builders (and, therefore, the residence) back to Simonson. Simonson told Levenhagen that the transfer was necessary because Kenneth North wanted Simonson to be the seller to a new buying partner. Even though Simonson received substantial funds from the secret loan, he told Levenhagen that he had no funds to make mortgage payments on the residence, so Levenhagen continued to make the payments while Simonson lived at the residence.

The residence property changed hands a few more times. Mark Laing owned the property in late 2005.[1] And in December 2007, David Laning took control of the property and Levenhagen was finally repaid for the mortgage payments he had made.

### B. Fraud on the Bankruptcy Court

In January 2006, the bankruptcy trustee instituted an adversary proceeding against Simonson based on activity associated with Simonson obtaining a tax refund.[2] The bankruptcy court issued multiple restraining orders restricting the movement of Simonson's assets and eventually froze his assets altogether.

Jackson failed to comply with these orders. In numerous transactions, Jackson violated the court's orders by accepting funds on Simonson's behalf and disbursing funds pursuant to Simonson's specific directions—e.g., agreeing to deposit $170,488.86 into his IOLTA Trust Account on behalf of Simonson; issuing an IOLTA

---

[1] Mark Laing bought Network Builders, which owned the property.

[2] After the bankruptcy petition was filed, Simonson amended his prepetition tax returns and obtained a tax refund of approximately two hundred thousand dollars. Simonson still had some of the money in his personal accounts. The trustee filed the first adversary proceeding seeking to recover the remainder of the tax refunds Simonson had acquired.

account check to Key Bank payable to Merendon Mining, a tax shelter that was the apparent source of Simonson's retroactive tax refund; and purchasing a certified check also payable to Merendon Mining. Jackson then used multiple accounts to conceal the trail of money. Accordingly, the bankruptcy court granted the trustee's motion for sanctions against Jackson and his firm.

Jackson argued that he complied with court orders as soon as he became aware of them. But based on the totality of Jackson's demeanor during his testimony, the contradictions between his testimony and the exhibits, and the testimony of other, credible witnesses, the hearing officer concluded that Jackson lied to the bankruptcy court about his knowledge of the restraining orders to conceal his role in perpetrating fraud on the court. Based on the overwhelming evidence, the hearing office found that, in actively and intentionally participating in fraud on the bankruptcy court, Jackson violated 18 U.S.C. § 152. Although the hearing officer acknowledged the bankruptcy court's order granting a motion for sanctions against Jackson's firm, she independently relied on abundant documents and testimony to find that Jackson had violated discovery orders.

*C. Conflicts of Interest*

In April 2006, the trustee's attorney, Denise Moewes, filed a second adversary proceeding against parties who had played some role in the Kirkland residence transactions. The trustee sought to vacate the order of abandonment, to recover unauthorized postpetition transfers, and to compel turnover of the property. Michael Levenhagen, Mark Laing, David Laning, and their wives were among the named defendants. Five months later, Moewes filed a second amended complaint, adding

Simonson as a defendant. Although there were obvious conflicts of interest among Simonson, GFS, and the Levenhagens/Lanings/Laings, Jackson's firm accepted representation of all parties. Jackson arranged for attorney Greg Cavagnaro to represent Simonson but actively assisted Cavagnaro in the representation. Jackson arranged for Stephen Araki to represent the Levenhagens/Lanings/Laings but assisted in representing these clients as well.

Jackson and his firm had serious and intractable conflicts with the Levenhagens.[3] Recall that Jackson falsely signed the tax affidavit as Levenhagen's agent, and Jackson's escrow company closed Simonson's secret loan against the residence, knowing that Levenhagen actually owned the property. Levenhagen was unaware of this misconduct. The hearing officer also found that Jackson had conflicts with the Laings and Lanings.[4]

In addition, Simonson's interests often conflicted with the Levenhagens/Laings/Lanings. In representing all of these parties, Jackson actively ignored or concealed relevant facts to protect Simonson, thus compromising his ability to defend the Levenhagens/Laings/Lanings. For example, the complaint sought an order vacating the order of abandonment, alleging that Simonson had fraudulently misrepresented the value of the property to the bankruptcy court. In order to protect

---

[3] When Simonson initially arranged for Jackson to represent the Levenhagens, Laings, and Lanings and to pay their fees, Mike Levenhagen expressed concern about the potential for a conflict of interest.

[4] As of June 21, 2006, the Levenhagens, Laings, and Lanings all had valid potential claims against both Simonson and Jackson.

Simonson, Jackson withheld information that the three couples had no knowledge that the property had ever been abandoned in bankruptcy.[5]

The hearing officer found that Jackson and his firm violated the RPCs when they failed to disclose any of these conflicts to the Levenhagens, Laings, or Lanings and failed to obtain written consent to waive conflicts before accepting representation.[6] The hearing officer rejected Jackson's argument that he was not the attorney for Simonson or the Levenhagens, Laings, or Lanings during the bankruptcy proceeding. Although Jackson's partner, Stephen Araki, was the attorney of record for the Levenhagens, Laings, and Lanings, the hearing officer found that Jackson did most of the work associated with the representation. And although Greg Cavagnaro was Simonson's attorney of record in the bankruptcy proceeding, Jackson was Simonson's primary legal advisor for all issues related to the proceedings.

---

[5] For example, Jackson had an e-mail from Mike Levenhagen explaining that Simonson was one of Levenhagen's initial contracts and that at the time of the purchase, Levenhagen had no knowledge of the history or prior ownership of the property. Rather, he learned about Simonson's bankruptcy after the purchase in late December 2004. This information was never mentioned in the Levenhagen/Laing/Laning answer.

[6] Jackson did not inform the Levenhagens, Laings, or Lanings that he had actively participated in defending Simonson in the first adversary proceeding, that he was still providing legal services to Simonson in connection with the bankruptcy proceeding, or that he was personally involved in the transfers at issue in the lawsuit. The hearing officer found that Jackson's firm should have informed the parties of these previous dealings, which created a significant risk of conflict, and should have obtained written consent to waive those conflicts before accepting representation. Instead, Jackson's firm simply sent a letter dismissing any notion that a conflict existed; the hearing officer found that the letter did not comply with RPC 1.7(b) because it falsely represented that there was no potential for a conflict of interest.

To conclude, the hearing officer found that there were serious conflicts of interest but Jackson represented all of these clients to protect his and Simonson's interests.

### D. Discovery Violations

During the second adversary proceeding, which was brought to recover the property, Moewes made numerous requests for production of documents from the Levenhagens, Laings, and Lanings. These parties promptly sent the requested documents to Jackson. Jackson, upon receipt of the documents, repeatedly withheld highly relevant information and sometimes even modified documents to obscure their relevance.[7] On October 27, 2008, the bankruptcy court issued a 47-page decision finding that Jackson's firm had withheld relevant documents.

After a lengthy recitation of specific discovery violations, the hearing officer found that Jackson repeatedly withheld documents during the bankruptcy proceeding, and those he did produce, he produced late enough to prevent Moewes from being able to prepare for court proceedings and depositions. The hearing officer found that Jackson knowingly and intentionally withheld relevant documents to conceal his role in the fraud and to avoid inculpating Simonson. These documents, had they been provided, would have revealed Simonson's involvement with GFS and helped establish that the Levenhagens, Laings, and Lanings were victims and not parties to the bankruptcy fraud. Jackson never informed his clients that he was withholding the documents, and they did not consent to the documents being withheld.

---

[7] Exhibit A-284 is over 1200 pages and contains a full description of irregularities Moewes discovered.

9

At the disciplinary hearing, Jackson was unable to explain why omitted documents had not been produced. He claimed that he had no access to some of the documents because another attorney had withheld documents and because he had given between 6 to 10 boxes of documents to attorney Marc Stern, who only delivered one or two boxes of requested copies back to Jackson. The hearing officer found Jackson was not credible, concluding that Jackson had provided false testimony to support his defense of this charge.

Jackson also argued that he was not aware that he needed to produce e-mails. The hearing officer rejected this argument because the requests clearly applied to e-mails and Jackson actually told his clients to forward e-mails to him. .

## II. Dainard Matter

In the Dainard matter, Jackson partnered with his clients Rob and Claire Dainard to purchase an investment property. The property had development potential because it was zoned multifamily and was adjoined by two properties that were also amenable to development. Jackson lied on a mortgage application to obtain a loan at a more favorable interest rate. Jackson then lied to the Dainards about his involvement with another client and business partner, Kenneth North, who sought to purchase the same three properties for development. Jackson intentionally deceived the Dainards to induce them to offer to sell their interest in the property.

*A. Misrepresentations on the Home Mortgage*

Beginning in 2000 and continuing through 2007, Jackson was the attorney for Robert and Claire Dainard. Jackson and his wife became friends with the Dainards

10

during this period. At the time of the events associated with this grievance, Jackson was representing Claire Dainard in a personal injury action.

In October 2005, the Dainards became interested in a property at 115 Webster in Chelan County for its development potential. With Jackson's help, they signed a purchase and sale agreement for 115 Webster. Soon after, Jackson convinced the Dainards to allow him and his wife to join in the investment. In November 2005, the Jacksons and the Dainards formed RPC[8] Enterprises LLC to purchase the property. But first, Jackson convinced the Dainards to transfer the purchase and sale agreement for 115 Webster to Jackson and his wife because Jackson would be able to obtain better financing through his contacts at Bank of America.

On June 7, 2006, Mr. Dainard received a copy of correspondence between Jackson and Ancora Financial regarding a loan. When asked, Jackson told Mr. Dainard that Bank of America had not worked out. A week later, to get a more favorable loan agreement, Jackson misrepresented that the property was his second home on a mortgage application.[9] At the same time, Jackson signed a "Second Home Rider," which likewise stated that the property was to be used as the Jacksons' second home. The hearing officer concluded that Jackson intentionally violated 18 U.S.C. § 1344 when he signed the Second Home Rider and falsely claimed the property as his second home.

---

[8] "RPC" is presumably an acronym for Robert/Patricia/Claire; it is ironic in light of the number of RPC violations accompanying its formation.

[9] Even though Jackson told the Dainards he would quitclaim the property immediately, he did not file the paperwork to quitclaim 115 Webster to RPC Enterprises until September 2007, and even then he incorrectly listed the grantee as "RPC LLC."

At the hearing, both Jackson and his wife argued that the Dainards had arranged the financing and that they discovered the Second Home Rider language only at closing. The Jacksons further argued that they signed the rider because they were concerned that if they did not, the Dainards would lose their earnest money deposit. The hearing officer rejected this testimony as false, finding that it was directly contradictory to other, more credible evidence—e.g., the loan officer testified that he dealt only with Jackson, and the original loan application, signed six weeks before closing, stated that the property would be used as a second home. The hearing officer also found that it was not credible that Jackson had missed the references to the property being used as a second home because the evidence demonstrated that Jackson paid great attention to detail. Accordingly, the hearing officer concluded that the Dainards were not informed of and did not consent to the false representations.

*B. Conflicts of Interest*

During the time the Dainards/RPC Enterprises owned 115 Webster, Jackson, acting on behalf of himself and North, attempted to acquire 115 Webster, along with the two adjoining properties. He did this without apprising the Dainards, even though he knew the Dainards had purchased 115 Webster with an eye towards acquiring the adjoining properties for development.[10]

In March 2007, Jackson signed a purchase and sale agreement binding RPC Enterprises to purchase the Mack property (one of the adjoining properties) without informing the Dainards. He did so to lock up the property so that he and North could

---

[10] Early on, Mr. Dainard specifically asked Jackson if he represented North. Jackson lied and said, "No."

explore the full investment potential of the three properties. Jackson did not have the authority to enter into the agreement, and had the Dainards been aware of the transaction, they would not have authorized it. In the ensuing months, Jackson continued his efforts to secure the three properties for North. In September 2007, North made a presentation at a Chelan winery regarding a condo development on the three properties, even though he had not acquired 115 Webster yet. When the Dainards learned about the presentation, they informed Jackson that they were not interested in doing business with North. The Dainards eventually decided not to accept any purchase offers on the property.

The hearing officer found that from the inception, there was a significant risk that Jackson's representation of RPC Enterprises and the Dainards would be materially limited by his personal interests and his responsibilities to other concurrent clients—specifically Kenneth North. Nevertheless, Jackson persisted in his representation of all parties, and never informed the Dainards of his involvement with North, who was similarly interested in developing 115 Webster and its adjoining properties. The hearing officer found that the Dainards provided credible evidence that they had no knowledge of Jackson's actions; none of the numerous e-mails concerning the three properties were copied to the Dainards.

The hearing officer rejected Jackson's argument that he had no attorney-client relationship with North. Jackson admitted to representing one or more of North's companies. In addition, Jackson drafted numerous documents for North and his company, provided advice to North, and maintained North's funds in his trust account.

The hearing officer concluded that these activities created a reasonable belief on the part of North that Jackson was his attorney.[11]

## PROCEDURAL HISTORY

On August 20, 2010, the Washington State Bar Association (Association) filed a formal complaint, charging Jackson with 14 counts of misconduct. By agreement, the matter was set for hearing on April 4, 2011. On March 8, 2011, Jackson moved to continue the hearing until June 13, 2011, on the grounds that two potential witnesses would be out of the area. The hearing officer denied the motion. The hearing commenced as scheduled on April 4, 2011.

On August 17, 2011, the hearing officer issued her Findings of Fact, Conclusions of Law, and Hearing Officer's Recommendation. The hearing officer concluded that the Association had proved all of the violations alleged in the formal complaint and recommended that Jackson be disbarred.

On September 2, 2011, the Board notified Jackson's counsel of the Board briefing schedule and the date for oral argument if requested. Jackson never filed a brief, and neither party requested oral argument.

On November 17, 2011, two business days before the Board was to consider the case without oral argument, Jackson filed a motion to continue the Board's consideration until January 2012. The Board denied the motion, noting that Jackson

---

[11] At the disciplinary hearing, Jackson intentionally attempted to conceal the nature of his relationship with North by resisting the Association's demands for documents and providing false statements regarding the location of documents and his ability to retrieve documents. When Jackson finally produced the materials, the Association was able to document the presence of North's funds in Jackson's trust account, a fact that substantially undercut his contention that North was not his client.

could raise whatever issues he wished to raise before this Court. On November 18, 2011, the Board adopted the hearing officer's decision and recommendation.

On December 8, 2011, the Association served and filed a timely statement of costs and expenses under ELC 13.9(d). Jackson filed no exceptions. On January 11, 2012, the Board entered an order assessing costs and expenses against Jackson in the amount of $25,517.49.

Jackson filed a timely notice of appeal on December 16, 2011, and submitted his opening brief on March 4, 2013.[12] On August 20, 2013, we informed the parties that the case had been set for oral argument on November 12, 2013. Jackson did not acknowledge receipt of this letter. On October 18, 2013, the Association moved to strike oral argument and have the case decided on the briefs. Jackson did not file an answer. On October 30, 2013 we granted the Association's motion to strike oral argument and decided to consider the case on the merits on November 12, 2013 without oral argument. RAP 11.4(j). On November 12, 2013, we received Jackson's motion to withdraw his appeal. RAP 18.2. We denied the motion.

---

[12] After filing his notice of appeal, Jackson made four motions to extend the deadline for filing his opening brief, which we granted. The final deadline for filing was set for October 11, 2012. In the meantime, Jackson filed a motion to exceed the brief page limitation. On October 19, 2012, we received and rejected Jackson's opening brief, which was 104 pages in length, more than twice the permitted length of 50 pages. See ELC 12.6(f); RAP 10.4(b). Given the unique circumstances of the case, we allowed Jackson to file an opening brief not to exceed 65 pages in length and to be served and filed no later than November 9, 2012. Jackson also made a motion to supplement the record, which the commissioner denied. Jackson then moved to modify the Commissioner's ruling. On February 6, 2013, after multiple motions to extend briefing deadlines, we denied his motion to modify. On February 11, 2013, we established a new briefing schedule, with Jackson's opening brief due on February 28, 2013. We then granted Jackson's sixth motion to extend the deadline for the filing of his opening brief, setting the final deadline for March 4, 2013. Jackson met this deadline.

## ISSUES PRESENTED

1. Did the hearing officer err in denying Jackson's motion to continue the hearing?

2. Did the hearing officer err in failing to recuse herself for bias?

3. Did the hearing officer improperly consider the bankruptcy court orders as evidence of Jackson's discovery violations?

4. Did the hearing officer err in admitting e-mail exchanges between Jackson and Simonson into evidence?

5. Are the hearing officer's findings of fact supported by substantial evidence?

6. Did the Association prove by a clear preponderance of the evidence that Jackson violated RPC 1.8(a) and 18 U.S.C. § 152?

7. Did the disciplinary counsel commit misconduct?

8. Did the Disciplinary Board err in recommending disbarment?

## ANALYSIS

This court "bears the ultimate responsibility for lawyer discipline in Washington." *Marshall*, 160 Wn.2d at 329. Nevertheless, "we give considerable weight to the hearing officer's findings of fact." *Id.* at 329-30. We treat unchallenged findings as verities on appeal. *Id.* at 330. We accept challenged findings of facts as long as they are supported by substantial evidence. *Id.* "Substantial evidence" is "evidence sufficient 'to persuade a fair-minded, rational person of the truth of a declared premise.'" *Id.* (internal quotation marks omitted (quoting *In re Disciplinary Proceeding Against Poole*, 156 Wn.2d 196, 209 n.2, 125 P.3d 954 (2006)).

16

We review challenged conclusions of law de novo. The Association must prove misconduct by a clear preponderance of the evidence. *Id.*; ELC 10.14(b). This standard requires more proof than a simple preponderance but less than beyond a reasonable doubt. *Id.*

## I. Jackson's Procedural Challenges Fail

Jackson argues that the hearing officer erred in denying his motion to continue the hearing and in failing to recuse herself due to bias. Both of these claims are wholly unsupported by facts or law.

### A. Hearing Officer Properly Exercised Discretion in Denying Jackson's Motion for Continuance

Jackson contends that the hearing officer erred in denying his motion to continue the hearing. Under ELC 10.12(f), a hearing officer has discretion to grant either party's motion for a continuance of the hearing date. Generally, a reviewing court will not disturb a discretionary act absent a showing of manifest abuse of discretion. *See In re Disciplinary Proceeding Against Whitney*, 155 Wn.2d 451, 465, 120 P.3d 550 (2005). "'An abuse of discretion occurs only when no reasonable person would take the view adopted.'" *Id.* (quoting *In re Disciplinary Proceeding Against Bonet*, 144 Wn.2d 502, 510, 29 P.3d 1242 (2001)).

Here, Jackson's motion contended that necessary witnesses, including his wife (Patti Jackson) and Clay Terry, were not available during the hearing. The hearing officer denied Jackson's motion. The hearing officer found that Terry was available to testify by telephone; Patti Jackson was present and testified.

On appeal, Jackson argues that denial of his motion prevented him from presenting the testimony of a key witness who was in Iraq at the time of the hearing. From the record, it appears this witness was Clay Terry. Jackson argues that contrary to the hearing officer's findings, Terry was not available for a phone call because he was in an "extremely hostile location in the front lines of Iraq." But the record shows that Jackson was given multiple opportunities to obtain Terry's declaration but simply decided not to. Although Jackson discussed the difficulty of obtaining Terry's declaration due to the time difference, he never mentioned a hostile environment as a barrier to communication. And Jackson's counsel ultimately agreed that the time difference was not an insurmountable challenge. The record does not reveal, and Jackson has not submitted, any evidence that Terry was unavailable for a phone call due to a hostile environment in Iraq.

Jackson also unconvincingly argues that denying his motion was prejudicial. Jackson vaguely contends that Terry had "considerable knowledge regarding Mr. Dainard as he had worked with him for years and had personal knowledge of the [115] Webster property." But Jackson fails to specify what Terry's testimony would have revealed. Thus, Jackson has not shown that he was prejudiced by the hearing officer's decision. The hearing officer correctly found that Jackson had failed to establish either good cause for continuance or prejudice in the event the hearing commenced as scheduled.

B. *No Evidence of Hearing Officer's Bias*

Due process of law, the appearance of fairness doctrine, and ELC 2.6(d)(4) require a hearing officer to disqualify herself only if she is biased or if her impartiality

may reasonably be questioned. *See Wolfkill Feed & Fertilizer Corp. v. Martin,* 103 Wn. App. 836, 841, 14 P.3d 877 (2000); *State v. Dominguez,* 81 Wn. App. 325, 328, 914 P.2d 141 (1996); *see also Hill v. Dep't of Labor & Indus.,* 90 Wn.2d 276, 279, 580 P.2d 636 (1978) (common law rules governing disqualification for conflict of interest apply to administrative tribunals). A hearing officer is presumed to be impartial, and a party who alleges bias must affirmatively establish his or her claim based on facts in the record, not bald accusations, speculation, or innuendo. *In re Disciplinary Proceeding Against King,* 168 Wn.2d 888, 904-06, 232 P.3d 1095 (2010). Jackson fails to rebut the presumption of impartiality.

Jackson unconvincingly argues that the hearing officer was biased. First, he argues that the hearing officer showed bias by denying Jackson's motion for continuance and commenting that the absent witness was available via phone. Jackson claims this was biased because it was "an absurd request and would have been life threatening" for the witness to speak on the phone. But, as explained, Clay Terry was available to speak on the phone and the hearing officer gave Jackson many opportunities to secure Terry's testimony. In any event, this is not evidence of bias.

Jackson also argues that the hearing officer was biased because she found that Jackson was slow or deficient in providing financial records when requested but ignored testimony and exhibits to the contrary. But the portions of the transcript Jackson cites to do not evidence any bias on the part of the hearing officer. In fact, the transcript indicates that Jackson was indeed slow in providing financial documents when requested.

Last, Jackson argues that the hearing officer's comments that she did not find him or his wife to be credible confirm her bias. We give great weight to the hearing officer's evaluation of the credibility and veracity of the witnesses she observes firsthand. *In re Disciplinary Proceeding Against Marshall*, 167 Wn.2d 51, 67, 217 P.3d 291 (2009). Here, there is no evidence that would require us to overturn the hearing officer's determination that Jackson and his wife were not credible witnesses. The hearing officer examined hundreds of exhibits, and compared the contents and dates from those exhibits to Jackson's and his wife's testimony. On numerous occasions, documents directly contradicted Jackson's and his wife's sworn statements.

On appeal, in support of his and his wife's credibility, Jackson offers e-mails and letters that allegedly corroborate his wife's testimony. But, it is unclear how the two e-mails and two letters corroborate his wife's testimony because Jackson does not additionally cite to the transcript. Moreover, even assuming his wife's testimony is identical to these four documents, that, in and of itself, does not render her and her husband credible witnesses in light of the numerous contradictions noted by the hearing officer.

Jackson's complaints are unfounded. Jackson fails to make a persuasive argument that any of the hearing officer's adverse rulings were the result of bias or prejudice. Moreover, Jackson never moved to disqualify the hearing officer. We hold that there is no cause to dismiss or remand for a new hearing.

II.   Jackson's Evidentiary Challenges Fail

Jackson argues that the hearing officer erred in giving preclusive effect to the bankruptcy court's sanctions order and in admitting e-mails that should have been

protected under attorney-client privilege. Both of these claims fail because the hearing officer independently determined that Jackson had violated discovery orders and the e-mails were admitted without objection, subject to a protective order.

*A. Hearing Officer Independently Found Jackson Had Violated Discovery Orders*

Jackson argues that the bankruptcy court's order granting the trustee's motion for sanctions against Jackson's law firm was error and should not have been admitted in his disciplinary hearing. He contends that Bankruptcy Judge Karen Overstreet's decision violated his due process rights because "no motion was before her and no evidentiary hearing was held." This is false because the bankruptcy judge clearly considered and ruled on the pending sanctions motion. Jackson, his wife, and his law firm all submitted materials to oppose the sanctions motion. The court heard oral argument on the motion on July 11, 2008, and asked the parties for supplemental materials. The trustee submitted a supplemental declaration. Jackson and his codefendants submitted 10 additional supplemental pleadings. Upon reviewing the materials, the bankruptcy judge issued a 47-page decision, finding that Jackson's firm had withheld relevant documents, in violation of a discovery order. The bankruptcy judge thoroughly considered the issue. Jackson has not argued that the bankruptcy judge ruled incorrectly on the motion. Furthermore, Jackson has not offered any authority for why he should have received an evidentiary hearing.

Jackson also argues that "[n]o guilt or disciplinary action should have been inferred" from the bankruptcy court's decision because Judge Overstreet was biased. But Jackson offers no evidence of bias. Jackson points to a single "telling" comment he believes substantiates Judge Overstreet's bias: "the defendants have submitted all

this information about the bad acts of Langford and GFS and all these other cases. It's completely irrelevant to this case." It is not clear how this statement evidences bias on the part of Judge Overstreet. The judge was just stating that evidence of other parties' bad acts are irrelevant—i.e., they do not excuse or justify Jackson's bad acts in the current proceeding.

Also, the hearing officer made clear that she would not give preclusive effect to Judge Overstreet's decision granting the motion. The hearing officer admitted Judge Overstreet's ruling but noted that she had independently resolved the discovery violation issue by comparing the documents that were in Jackson's possession with those actually produced in response to the trustee's requests. The hearing officer reviewed exhibits and independently verified each of the entries on the exhibits before reaching her conclusions. In other words, the hearing officer found that Jackson violated discovery orders, based on the overwhelming evidence before her, not on the bankruptcy court's decision.

B. *Hearing Officer Properly Admitted the E-mails, Subject to a Protective Order*

This court reviews evidentiary rulings for abuse of discretion. *See Cox v. Spangler,* 141 Wn.2d 431, 439, 5 P.3d 1265 (2000). In disciplinary hearings, evidence is admissible if the hearing officer determines it is "the kind of evidence on which reasonably prudent persons are accustomed to rely" on and not irrelevant, immaterial, or unduly repetitious. ELC 10.14(d)(1). In the instant case, the hearing officer did not abuse her discretion in admitting the e-mails at issue, subject to a protective order.

Jackson argues that e-mails he exchanged with Simonson should have been protected under attorney-client privilege.[13] He acknowledges that attorney-client privilege does not protect attorney-client communications made in furtherance of crime or fraud. *State v. Richards*, 97 Wash. 587, 591, 167 P. 47 (1917) (communications involving proposed blackmail); *Cedell v. Farmers Ins. Co. of Wash.*, 176 Wn.2d 686, 699, 295 P.2d 239 (2013). But he argues that the crime-fraud exception does not apply here because the Association had not proved that a crime or fraud was committed and that communications were made in furtherance of that crime.[14] He specifically takes issue with the admission of Ex. A-170.

However, the hearing officer admitted exhibit A-170 into evidence on April 8, 2011 without objection, and not through application of the crime-fraud exception. The only issue was whether the exhibit should be protected. The hearing officer noted that exhibit A-170 included e-mails between Jackson and Simonson and asked for briefing on whether the crime-fraud exception applied to these communications. If it did, the hearing officer explained that she would lift the protective order on some of the communications, including exhibit A-170.

The Association ultimately argued that the exception did apply but that exhibit A-170 should, nevertheless, be subject to a protective order under ELC 3.2(e). *See*

---

[13] Note that elsewhere in his brief, Jackson argues that he was not Simonson's attorney.

[14] Although the crime-fraud exception used to apply only to criminal activity, the exception now applies to advice or assistance for the purpose of perpetrating a civil fraud as well. *Escalante v. Sentry Ins. Co.*, 49 Wn. App. 375, 394, 743 P.2d 832 (1987). A court engages in a two-step process whenever the civil fraud exception is asserted. *See Cedell*, 176 Wn.2d at 700. But this procedure is not required when evidence is admitted without objection.

*In re Disciplinary Proceeding Against Schafer*, 149 Wn.2d 148, 166-67, 66 P.3d 1036 (2003) (even if disclosure required, court can still restrict disclosures to only those matters necessary for court proceedings). The hearing officer determined that exhibit A-170 was subject to a protective order. Again, Jackson did not object. Jackson's claim is a nonissue. *See generally* CR 37(d) (because discovery is intended to be broad, party wishing to assert privilege cannot simply keep quiet; it must either reveal information, disclose it has it and assert it is privileged, or seek protective order).

III.   Substantial Evidence Supports the Hearing Officer's Findings of Fact

Jackson generally claims that all of the hearing officer's 391 findings of fact are unsupported, noting that it is impossible to specifically assert error to each of the findings within the page limitation set forth by our court. Acknowledging this difficulty, we review his entire brief, and consider Jackson's specific assignments of errors as they arise within his other arguments. But we are not required to address findings not specifically referred to, and we reject challenges he fails to support with citations to the record or legal authority. *Marshall*, 167 Wn.2d at 67 (providing that a challenge is sufficient only if the attorney cites to the record in support of argument); RAP 10.3(a)(6) (arguments in a brief should contain citations to the record and legal authority).

### A. Jackson Had a Financial and an Ownership Interest in Various Companies

Jackson argues that there is no evidence that he had a financial interest in New Century Builders or Chelan Landing LLC "or any other company for that matter."[15] The fact that he has no ownership or financial interest in New Century Builders is not pertinent to any of the counts alleged against him.[16] And we should reject Jackson's other challenges because he does not cite to the record or any legal authority to rebut the hearing officer's findings on this issue. The hearing officer found that Jackson participated in the formation of Chelan Landing, LLC and was the registered agent and organizer of this company. In addition, his company, Jackson-Field Enterprises, LLC, was a member of the Chelan Landing, LLC and entitled to participate in its management. The hearing officer specifically rejected Jackson's claim that he had no interest in Chelan Landing.

Also, the record directly contradicts Jackson's statement that he had no financial interest in "any other company." Jackson and his wife co-owned RPC Enterprises with the Dainards and co-owned Jackson-Field Enterprises with the Fields. Thus, Jackson's claim that he had no financial interest in any of these companies fails.

---

[15] Jackson's interest in these companies implicates Counts 11-13, which deal with Jackson's duty to avoid conflicts of interest. Of these, only Counts 11 and 12 carried with them a presumptive sanction of disbarment.

[16] New Century Builders is owned by Kenneth North.

## B. *Jackson Was Simonson's Attorney during the Bankruptcy Proceeding*

Jackson argues that there is no evidence he represented Simonson in the bankruptcy proceeding. He points out that he did not have a PACER (Public Access to Court Electronic Records database) account with the bankruptcy court at the time, and he never signed any of the pleadings. Also, he was not the attorney of record for Simonson. Accordingly, he argues that it was wrong for the hearing officer to attribute attorney misconduct during the bankruptcy proceeding to Jackson.

Jackson made similar arguments during his disciplinary hearing, and the hearing officer rejected them. The hearing officer found that although Greg Cavagnaro was Simonson's attorney of record in the bankruptcy proceeding, Jackson was Simonson's primary legal advisor for all issues related to the proceedings. Jackson's time records reflected many hours of researching, attending meetings, and preparing for the first and second adversary proceedings. E-mails reflect that Jackson was Simonson's primary legal advisor regarding the bankruptcy. After Jackson began representing the Levenhagens, Laings, and Lanings, he continued to spend hours conferencing with Simonson, often without Cavagnaro present. And when Simonson was added to the second adversary proceeding, Jackson continued to advise him and draft and edit his pleadings. Thus, the mere fact that he did not have PACER account or that he did not sign pleadings is not sufficient to rebut the hearing officer's findings, which are supported by substantial evidence.

Jackson additionally argues that he could not have violated discovery orders because he had no records. But he offers no new evidence and instead relies on the

same facts and testimony he offered at his disciplinary hearing.[17] The hearing officer specifically rejected Jackson's contrary evidence and found that Jackson, acting as Simonson's attorney, knowingly violated the bankruptcy court's restraining orders. Thus, we reject this claim. *Marshall*, 160 Wn.2d at 331 (not sufficient for attorney to merely re-argue his version of facts); *Poole*, 156 Wn.2d at 212 (we will not overturn findings of fact based merely on alternative explanations or versions of the facts already rejected by the hearing officer and board).

C. *Jackson Was Kenneth North's Attorney*

As he did at his disciplinary hearing, Jackson argues generally that he was never Kenneth North's attorney and, specifically, that he was not involved in North's presentations at the winery regarding the condo development. These facts implicate counts 8-14, which involve Jackson's duty to avoid conflicts of interest. Jackson does not offer any compelling evidence in support of this contention.

Jackson first argues that he had no attorney-client relationship with North because Jackson merely acted as a messenger, conveying information between North and other parties to various transactions. However, he does not cite to the record for support.

He also argues that there was no attorney-client relationship because the record is devoid of any evidence that North believed Jackson was his lawyer. He cites

---

[17] Jackson asserts that he and Stephen Araki turned over all pleadings and files to Marc Stern, who failed to return copies. It is true that Leanne Volz, who worked with Jackson, testified that they sent boxes of documents to Stern and received a portion of those boxes back. But the hearing officer heard this testimony and rejected it, reasoning that Araki's testimony directly contradicted Jackson's and Volz's statements concerning the files.

*State v. Hansen*, 67 Wn. App. 511, 837 P.2d 651 (1992), for the proposition that the existence of an attorney-client relationship turns on the client's subjective belief that it exists. However, *Hansen* also held that the client's belief will control only if it is reasonably formed based on attending circumstances, including the attorney's words or actions. *Id.* (*aff'd*, 122 Wn.2d 712, 720, 862 P.2d 117 (1993) (no attorney-client relationship where total contact consisted of only one phone call where attorney said he would not take the case)); *see also Bohn v. Cody*, 119 Wn.2d 357, 363, 832 P.2d 71 (1992). Here, Jackson provided legal advice to multiple legal entities owned by North and helped North form companies, including Cedar Hollow Development, New Century Builders and Chelan Landing, LLC. E-mails between North and Jackson show that Jackson acted at North's direction when he made offers on various properties, negotiated contracts, and held funds. And, Jackson kept North's funds in his trust accounts and made payments at North's direction. Thus, we find that substantial evidence supports the hearing officer's finding that Jackson had an attorney-client relationship with Kenneth North.

### D. The Dainards Had No Knowledge of Jackson's Involvement with North

Jackson reasserts his argument that Mr. Dainard knew of Jacksons' involvement with North the entire time. But, Jackson has not offered any evidence to rebut the hearing officer's findings that Jackson intentionally concealed his involvement with North in order to benefit himself and North. Jackson points to e-mails wherein Dainard does not mention North. This is not evidence that Mr. Dainard knew of Jackson's involvement with North.

To conclude, we hold that Jackson's general assignment of error to all of the hearing officer's findings of fact and law are insufficient. *In re Disciplinary Proceeding Against Kronenberg,* 155 Wn.2d 184, 191, 117 P.3d 1134 (2005) (to challenge findings of fact, respondent attorney must argue why specific findings are unsupported and cite to the record to support the argument). Jacksons' specific assignments of error to certain findings of fact also fail. He offers little to no evidence to support his claims. And ultimately, many of the hearing officer's findings of fact were the result of credibility determinations based on abundant testimony and exhibits. Considering we give great weight to the hearing officer's evaluation of the credibility and veracity of the witnesses he observes firsthand, there is not enough evidence to overturn the hearing officer's findings. *See Marshall,* 167 Wn.2d at 71.

IV. The Hearing Officer's Conclusions of Law Are Supported by the Facts

Jackson explicitly challenges the hearing officer's conclusions that he violated RPC 1.8(a), charged in counts 8 and 9, and 18 U.S.C. § 152, charged in count 2. In addition, Jackson appears to challenge the hearing officer's conclusion that he violated RPC 8.4(b) and (c), charged in count 6.

We review each of Jackson's challenges to the hearing officer's conclusions of law de novo. *Marshall,* 160 Wn.2d at 330. "The Association must prove misconduct by a clear preponderance of the evidence." *Id.*; *see also* ELC 10.14(b). We will uphold the hearing officer's ultimate conclusion relating to any misconduct "if it is supported by substantial evidence in the record that the lower court could reasonably have found would meet the clear preponderance standard." *Marshall,* 160 Wn.2d at 330.

The hearing officer issued conclusions of law regarding each charged count of misconduct. In each of the counts discussed below, the hearing officer found that Jackson acted knowingly, causing injury or potential injury.[18] We find that the Association has met its burden of proving misconduct by a clear preponderance of the evidence.

### A. Count 2: Jackson's Conduct Violated 18 U.S.C. § 152

Count 2 involves Jackson's participation in the fraud on the bankruptcy court. We hold there was substantial evidence that Jackson committed fraud, in violation of 18 U.S.C. § 152, which prohibits the concealment of the debtor's assets.

As he did at his disciplinary hearing, Jackson argues that there was no evidence that he made payments and transferred funds in knowing violation of any court order. The hearing officer found Jackson's testimony was not credible. Specifically, the documents, the timing of the events, and the substance of his communications with Simonson all rebutted Jackson's claim that he acted without knowledge. The hearing officer concluded that by transferring funds into and out of his trust account in February and March 2006, in contravention of a restraining order, Jackson knowingly violated 18 U.S.C. § 152 and RPC 8.4(b). Thus, we reject Jackson's claim that the "record is devoid" of any proof of this violation.

---

[18] Under the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 ed. & Supp.1992) (ABA *Standards*), a lawyer acts with "knowledge" "'when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result.'" *In re Disciplinary Proceeding Against Stansfield*, 164 Wn.2d 108, 123, 187 P.3d 254 (2008) (quoting ABA STANDARDS at 6).

### B. Count 6: Jackson's Conduct Violated RPC 8.4(b) and/or RPC 8.4(c)

Count 6 alleges that Jackson made a false statement on a mortgage application and on a Second Home Rider involving 115 Webster. The hearing officer found that this conduct violated RPC 8.4(b) (by violating 18 U.S.C. § 1344) and RPC 8.4(c).[19] As he did at the hearing, Jackson denies that he had the mental state for fraud and denies his conduct violated the law. We find that substantial evidence supports the hearing officer's findings.

Jackson's argument that it was the Dainards who obtained the financing for 115 Webster is as unconvincing now as it was at his hearing. He offers no credible evidence as support. Because substantial evidence supports the hearing officer's finding that Jackson violated the law, causing harm to the Dainards, we reject Jackson's challenge.

### C. Counts 8 and 9: Jackson's Conduct Violated RPC 1.8(a)[20]

Counts 8 and 9 allege that Jackson violated the rules pertaining to business transactions with or adverse to a client. Because the presumptive sanction for both of these counts was admonition and not disbarment, we need not review Jackson's

---

[19] The RPC's were amended effective September 1, 2006. The formal complaint charged Jackson with violating RPC's in effect as of the date of the alleged conduct. Where amendments did not change the RPC provisions at issue, we cite to the current RPC's. Current RPC 8.4(b) states that it is professional misconduct to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer." Current RPC 8.4(c) states that it is professional misconduct to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

[20] Current RPC 1.8(a) states, "A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client" unless the terms are fair and reasonable, the client is advised in writing, and the client gives informed consent.

challenges.[21] *In re Disciplinary Proceeding Against Petersen*, 120 Wn.2d 833, 854, 846 P.2d 1330 (1993) (if facts sufficient to disbar on certain counts, court need not review other charged counts).

To conclude, we reject Jackson's challenges to the hearing officer's conclusions of law. Nowhere does Jackson actually argue that the hearing officer's conclusions are not supported by findings of fact or that the findings are not supported by substantial evidence. He merely renews arguments that were raised and rejected at his hearing.

## V.    There Is No Evidence of Misconduct on the Part of Disciplinary Counsel

Jackson argues that various improper acts by Association's counsel violated his due process rights. All of these claims fail because there was no misconduct on the part of disciplinary counsel.

First, Jackson takes issue with Mr. Dainard's presence in the hearing room, and with the fact that disciplinary counsel conferred with Mr. Dainard during the disciplinary hearing. But, Jackson specifically stated during the hearing that he had no objection to Mr. Dainard's presence. *See* ELC 5.1(c)(5) (grievant has right to attend disciplinary hearing, subject to these rules and any protective orders). And, Jackson does not cite to any legal authority for the proposition that disciplinary counsel is forbidden from speaking with grievants. Thus, this claim fails.

---

[21] Briefly, however, Jackson does not raise any new arguments with regard to Counts 8 or 9. The hearing officer concluded that both violations were proved. The conclusions of law are supported by substantial evidence and by the unchallenged findings of fact. Jackson's bald assertion on appeal that there was no violation of RPC 1.8(a) fails.

Next, Jackson argues that Association's counsel intentionally presented the Dainards' perjured testimony. He argues that Mr. Dainard lied when he said he thought Bank of America was doing the loan for 115 Webster. Jackson claims that Mr. Dainard knew Ancora Financial was doing the loan because Mr. Dainard was copied on e-mails between Jackson and Jarred Teague (owner of Ancora Financial) and because Mr. Dainard was the one who corrected the original loan documents, which bore Ancora Financial's name. However, Mr. Dainard was not copied on the e-mails to which Jackson cites, and there is no evidence that Mr. Dainard corrected the original loan documents.

Jackson also claims that Mrs. Dainard falsely testified that she relied on Jackson to review the quitclaim deed when, in fact, David Hilyer prepared the deed. But Jackson's citations to the record indicate that it was Jackson who signed the quitclaim deed incorrectly transferring 115 Webster to "RPC, LLC," prepared and signed the excise tax affidavit, and who later corrected the original document to list the grantee as "RPC Enterprises, LLC."

Third, Jackson argues that disciplinary counsel intentionally delayed sending out Mr. Dainard's second grievance against Greg Cavagnaro, submitted on March 5, 2011, to the Association. He contends that the grievance would have "clearly revealed Mr. Dainard's lack of credibility." However, he does not specify how the grievance would have revealed a lack of credibility. He does not cite to any facts, evidence, or law to support this claim. Thus, Jackson has not alleged facts or law requiring us to overturn the hearing officer's evaluation of the credibility and truthfulness of the witnesses.

Jackson next argues that disciplinary counsel improperly submitted evidence relating to the bankruptcy proceedings even though those proceedings were erroneously conducted. He argues that it was improper to submit evidence of the bankruptcy proceedings without explaining that some of the missing documents (that were the subject of discovery violations) had been found. But, Jackson does not specify what documents had been found. Jackson stated that he recalled Ms. Moewes' stating that she had found some of the missing documents, but he cited generally to two incredibly lengthy documents that mostly contain information adverse to him. Jackson's equivocal statement is not sufficient to undermine the hearing officer's findings related to the discovery violations.

Last, Jackson argues that Association's counsel improperly subpoenaed Jackson's adult children's bank records even though Jackson's name is not on those accounts. Jackson contends that this violated privacy statutes. Under 12 U.S.C. § 3405, a government authority may obtain financial records protected by the Right to Financial Privacy Act of 1978 pursuant to an administrative subpoena only if (1) there is reason to believe that the records sought are relevant to a legitimate law enforcement inquiry and (2) a copy of the subpoena or summons has been served upon the customer or mailed to his last known address on or before the date on which the subpoena or summons was served on the financial institution together with a notice stating with reasonable specificity the nature of the law enforcement inquiry. Jackson does not allege any facts or evidence that the subpoenas violated this statute. Simply stating that the Association subpoenaed his adult children is not sufficient to allege a violation of § 3405.

VI.    Disbarment Is the Appropriate Sanction

The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) (ABA *Standards*) "govern lawyer sanctions in Washington." *Marshall*, 160 Wn.2d at 342. Based upon the ABA *Standards,* we use a three-step process to analyze a recommended sanction. *In re Disciplinary Proceeding Against Preszler*, 169 Wn.2d 1, 18, 232 P.3d 1118 (2010). First, we determine the presumptive sanction by analyzing "'the ethical duties violated, . . . the lawyer's mental state, and . . . the actual or potential injury caused by the lawyer's conduct.'" *Id.* (quoting *Marshall*, 160 Wn.2d at 342). Second, "we determine whether any aggravating or mitigating circumstances call for a departure from the presumptive sanction." *Id.* Third, if raised by the attorney being disciplined, "we evaluate the Board's recommended sanction based on '(1) [the] proportionality of the sanction to the misconduct and (2) the extent of agreement among the members of the Disciplinary Board.'" *Id.* (quoting *In re Disciplinary Proceeding Against Schwimmer*, 153 Wn.2d 752, 764, 108 P.3d 761 (2005)).

Although we are not bound by the Board's recommendation, "[w]e should not lightly depart from recommendations shaped by [the Board's] experience and perspective." *In re Disciplinary Proceeding Against Noble,* 100 Wn.2d 88, 94, 667 P.2d 608 (1983). "Accordingly, we will adopt the sanction recommended by the Disciplinary Board unless we are able to articulate specific reasons for adopting a different sanction." *Id.* at 95.

Here, the hearing officer concluded that the presumptive sanction was disbarment for 10 of the 14 counts. A unanimous board agreed. Jackson makes no

35

compelling argument that would warrant our reversal of the sanction. We hold that the hearing officer correctly concluded that the presumptive sanction should be disbarment.

### A. The Presumptive Sanction Is Disbarment for 10 of the 14 Counts

The hearing officer concluded, and the Board agreed, that disbarment was the presumptive sanction for 10 of the 14 counts, pursuant to standards 4.31, 6.61, 5.11, 6.11, 6.21, and 7.1. Although Jackson has assigned error to this conclusion, he does not set forth any argument to support the contention.[22] Jackson never argues that the hearing officer incorrectly applied the ABA *Standards* to determine the presumptive sanctions. Thus, we adopt the Board's decision in this regard.

### B. The Balance of Aggravating and Mitigating Factors Does Not Demand a Departure from the Presumptive Sanction of Disbarment

Aggravating or mitigating factors can alter the presumptive sanction, but only if they are sufficiently compelling to justify a deviation. *In re Disciplinary Proceeding Against Cohen,* 149 Wn.2d 323, 339, 67 P.3d 1086 (2003). In this case the hearing officer determined the applicable aggravating factors were dishonest or selfish motive, pattern of misconduct, multiple offenses, bad faith obstruction of a disciplinary proceeding, submission of false evidence during a disciplinary proceeding, refusal to

---

[22] Jackson argues that he was not Simonson's attorney during the bankruptcy proceeding and that Mr. Dainard did not suffer harm because he always controlled 115 Webster and the property was never actually sold to Kenneth North. Jackson's attack on these factual findings fails. The first finding is dealt with earlier in this opinion: there was sufficient evidence to support a finding that Jackson was Simonson's attorney. Also, Jackson fails to allege facts or law to support his argument that the Dainards did not suffer any harm. Thus, we accept the hearing officer's finding that Jackson's misrepresentations injured the Dainards.

36

acknowledge misconduct, and substantial legal experience. She found three mitigating factors: absence of prior discipline record, character or reputation, and imposition of other penalties with regard to count 4.

Jackson challenges only standard 9.22(g): his refusal to acknowledge the wrongful nature of his conduct.[23] This aggravating factor is appropriate where a lawyer admits that he engaged in the alleged conduct but denies that it was wrongful, or where he rationalizes the improper conduct as error. *In re Disciplinary Proceeding Against Ferguson*, 170 Wn.2d 916, 943-44, 246 P.3d 1236 (2011) (citing *In re Disciplinary Proceeding Against Holcomb*, 162 Wn.2d 563, 588, 173 P.3d 898 (2007)). It is also appropriate where the lawyer is unrepentant and continues to justify his actions despite abundant contrary evidence and his own conflicting testimony or where the lawyer excuses the violation as merely "'technical'" or "'unfortunate labeling.'" *Id.* at 945. These were all present in the current case. As the hearing officer noted, throughout the proceedings, Jackson denied wrongdoing or attempted to justify his conduct. He refused to acknowledge the conflicts of interest that arose from his representation of Simonson, the Levenhagens, the Lanings, and the Laings. He sought to blame others, including the bankruptcy judge and other lawyers, for much of what occurred. Thus, we reject Jackson's contention that this aggravating factor does not apply.

---

[23] Jackson also contends that the "vulnerable victim" factor is questionable. But this was not one of the aggravating factors the hearing officer listed or relied on.

We accept the hearing officer's finding that numerous and substantial aggravating factors outweighed mitigating factors. A balance of the enumerated factors does not justify a departure from the presumptive sanction of disbarment.

*C. Disbarment Is a Proportionate Sanction and the Board's Unanimous Sanction Recommendation Deserves Considerable Deference*

While we do not generally depart from a Board's recommendation, we will do so if we are persuaded that the sanction is inappropriate in light of the (1) disproportionality of the sanction to the misconduct or (2) the extent of disagreement among the members of the Board. *In re Disciplinary Proceeding Against Kuvara,* 149 Wn.2d 237, 259, 66 P.3d 1057 (2003).

Here, Jackson cites three dissimilar cases in an attempt to illustrate that disbarment is a disproportionate sanction for his misconduct: *Holcomb,* 162 Wn.2d 563; *In re Disciplinary Proceeding Against Greenlee,* 158 Wn.2d 259, 143 P.3d 807 (2006); *In re Disciplinary Proceeding Against McKean,* 148 Wn.2d 849, 64 P.3d 1226 (2003). We hold that these cases are not "similarly situated" to Jackson's. *In re Disciplinary Proceeding Against Christopher,* 153 Wn.2d 669, 686-87, 105 P.3d 976 (2005) (when evaluating proportionality, "we analyze whether the recommended sanction is proper when compared to similarly situated cases"). In *Holcomb,* we approved the Board's recommendation of a six-month suspension for two counts of misconduct where the presumptive sanction was suspension. In *Greenlee,* we approved the Board's recommendation of a six-month suspension for one violation of RPC 1.8(h) where the presumptive sanction was suspension. And in *McKean,* we approved the Board's six-month suspension recommendation for misconduct

involving a business transaction with a client and loans of client funds, and where the presumptive sanction for two of the three counts was suspension.

None of these cases is remotely similar to Jackson's. Here, we have fourteen counts of misconduct, 10 of which carry a presumptive sanction of disbarment. Notably, none of the above cases concerns fraud, deceit, and abuse of the legal process demonstrating a lawyer's unfitness to practice law. Given the pervasive misconduct in this case, we find that disbarment is a proportionate sanction.

Moreover, the Board's unanimous sanction recommendation is entitled to great deference. *In re Disciplinary Proceeding Against Day*, 162 Wn.2d 527, 538, 542, 173 P.3d 915 (2007). Jackson has provided no reason for us to reject the sanction. *Poole*, 156 Wn.2d at 209-10 (we generally affirm the Board's recommended sanction unless there is specific reason to reject it).

## CONCLUSION

In conclusion, Jackson committed the acts of misconduct alleged in counts 1 through 14. The misconduct was serious and pervasive. In light of the presumption that such misconduct should generally result in disbarment, we adopt the Disciplinary Board's recommendation and order that attorney Robert B. Jackson be disbarred from the practice of law.

No. 201,017-2

Wiggins, J.

WE CONCUR

Madsen, C.J.

Owens, J.

J.M. Johnson, J.

Stephens, J.

González, J.

Gordon McCloud, J.